[Cite as *In re E.C.*, 2014-Ohio-1660.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: E.C.                                         :

                                                    :        C.A. CASE NO.    25944

                                                    :        T.C. NO.    2011-1164

                                                    :        (Civil appeal from Common
                                                             Pleas Court, Juvenile Division)

                                                    :

                                                    :

                                          . . . . . . . . . .

                                    **O P I N I O N**

                    Rendered on the ____18th____ day of ____April____, 2014.

                                          . . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Appellee

CRISTY N. OAKES, Atty. Reg. No. 0081401, 2312 Far Hills Avenue, #143, Dayton, Ohio 45419
        Attorney for Appellant

                                          . . . . . . . . . .

FROELICH, P.J.

        {¶ 1}   Mother appeals from a judgment of the Montgomery County Court of

Common Pleas, Juvenile Division, which granted permanent custody of her child, E.C., to

Montgomery County Children Services ("MCCS").

{¶ 2}     Mother has three children, E.C., age two, who is the subject of this appeal, and M.O. and E.O., who were ages nine and seven at the time of the trial court's judgment. M.O. and E.O. have a different father than E.C. and were removed from Mother's custody prior to E.C.'s birth; they were in the temporary custody of a paternal grandparent. E.C. was removed from Mother's custody at birth and was placed in a foster home. The trial court proceedings involved the determination of a permanent placement for all three children, but this appeal concerns only the determination with respect to E.C.

{¶ 3}     E.C. was born on February 12, 2011, and MCCS filed a dependency complaint immediately thereafter, due to Mother's convictions for attempted child endangering and child abuse in 2009 and 2010. E.C. was adjudicated to be dependent in May 2011, and temporary custody was awarded to MCCS in July 2011. A case plan was developed to assist Mother with reunification.

{¶ 4}     E.C. has been with the same foster family for her whole life and is doing well there. She does not have any disabilities and her development is age-appropriate. Mother has had visitation with E.C. twice per week: two hours one day with E.C. only, and two hours another day with all three children. M.O. and E.O. have had some overnight visits with Mother as well. During one such visit in January 2013, the police were called to the house for a domestic disturbance. The details of this incident are unclear; someone called 911, but no one involved (Mother, her husband, and her step-father) was willing to discuss the incident, and/or they denied that there had been an altercation. The case plan was subsequently modified to include domestic violence education and anger management

classes.

{¶ 5} On January 28, 2013, MCCS filed a motion for permanent custody of E.C. A hearing was held on April 10, May 8-9, May 31, and June 4, 2013. On September 24, 2013, the trial court awarded permanent custody of E.C. to MCCS.

{¶ 6} Mother raises two assignments of error on appeal:

The court erred in awarding permanent custody to Children Services, as such was against the manifest weight of the evidence.

The trial court erred when it found by clear and convincing evidence that pursuant to R.C. 2151.414(D) that [sic] permanent custody was in the child's best interest.

{¶ 7} In Ohio, a trial court is authorized to terminate parental rights and to grant permanent custody to a children services agency in several enumerated circumstances. These circumstances include a finding, by clear and convincing evidence, that permanent custody is in a child's best interest, coupled with a finding that the child 1) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent, for one of the reasons specified in R.C. 2151.414(E), or 2) has been in the temporary custody of a public children services agency for twelve or more months of a consecutive twenty-two-month period. R.C. 2151.414(B); *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8. The burden of proof is on the children services agency. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14.

{¶ 8} In this case, MCCS alleged in its motion for permanent custody that E.C.

had been in its temporary custody for twelve or more months of a consecutive twenty-two-month period, and Mother concedes this fact. MCCS also alleged that E.C. could not and should not be placed with either parent within a reasonable time. However, because R.C. 2151.414(B) is written in the disjunctive, and because the parties agree that E.C. was in the custody of MCCS for twelve or more months of a consecutive 22-month period, MCCS was not required to also prove that E.C. could not be placed with either parent within a reasonable time.

{¶ 9} MCCS did have to prove, by clear and convincing evidence, that permanent placement with MCCS was in E.C.'s best interest. R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. These factors include the parents' criminal records, if any, including any offenses against children and other mistreatment or abandonment of children, and the existence of any siblings with respect to which the parents' parental rights have been involuntarily terminated.

{¶ 10} The burden of clear and convincing evidence "is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will

produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re R.L.H.*, 2d Dist. Montgomery No. 25734, 2013-Ohio-3462, ¶ 10, citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶ 11}** We review a trial court's decision regarding the best interest of a child for an abuse of discretion. *In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 66. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *In re D.H.*, 10th Dist. Franklin No. 11AP-761, 2012-Ohio-2272, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983); *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4.

**{¶ 12}** MCCS presented the following evidence with respect to E.C.'s removal from Mother's care, the case plan, E.C.'s best interest, and its decision to request permanent custody.

**{¶ 13}** Richard Bromberg, a clinical psychologist, assessed Mother for MCCS. Dr. Bromberg testified that Mother was "relatively intelligent" and "articulate" during their interactions, but he reported that his personality testing revealed that her "defensiveness score * * * was quite high," that she harbored a lot of resentment and anger, and that her trust level was very low, so much so that he believed the results of his personality testing were of questionable validity. Further, he observed that Mother exhibited "extreme under-reporting or minimizing of her behaviors and her problems," particularly related to the children; she blamed others for the situations in which she had gotten into trouble with law enforcement and MCCS. Dr. Bromberg described Mother as narcissistic, with a "certain degree of rigidity and compulsiveness." Based on this assessment, Dr. Bromberg concluded that

Mother's motivation for treatment was low. He also concluded that Mother exhibited some characteristics of a "physical abuser," and she admitted to Dr. Bromberg that she had abused one of her children. Mother's claim to have "fixed the problem" by learning some tools of discipline on her own "raised red flags" to Dr. Bromberg.

{¶ 14} Dr. Bromberg concluded that Mother likely had an unspecified personality disorder, possibly bipolar disorder, which interfered with her relationships. He recommended extensive counseling, additional parenting classes (beyond those originally included in the case plan), and anger management classes.

{¶ 15} Judith Wiley, a social worker and mental health counselor with Family Services, counseled Mother for more than a year for an "episodic mood disorder" and personality disorder "with narcissistic features." Wiley testified that Mother was initially resistant to treatment, but that she (Mother) "broke through her resistence" because she wanted to comply with MCCS's conditions and requirements. Mother attended 28 out of 46 scheduled appointments with Wiley in the fourteen months prior to the hearing, and Wiley testified that four of the missed appointments had been canceled by mutual agreement or due to conflicts in her own schedule. At the time of the hearing, Wiley testified that Mother was still having trouble identifying "symptoms and stressors that were impairing her coping abilities" and "articulat[ing] any perceived counseling needs." Wiley believed, however, that Mother understood the need for counseling, although her participation was motivated "primarily to comply with her Children Services case plan."

{¶ 16} Counselors, the case worker, and the paternal grandmother of Mother's two older children (who were in the grandmother's custody) presented some history and context

on Mother's relationship and struggles with the older children. Custody of those children was also at issue, and since those children had lived with Mother in the past, her ability to parent them effectively was relevant to her ability to parent E.C. Mother was convicted in 2009 of attempted child endangerment after she left the older children home alone at night, and they left the house. Mother was incarcerated and the children were placed in foster care and then with the paternal grandparent. The children returned to Mother's care in late 2009, but then, in 2010, she was convicted of abusing one of the children. The children were returned to the paternal grandparent under a safety plan.

{¶ 17} The paternal grandmother reported some challenges with visitation with Mother, because Mother would not be home with the children at an appointed time or would not have the children ready to go. There were also problems with the children getting their medications and attending school when they were at Mother's home for visits.

{¶ 18} Angela Hosier, the MCCS caseworker, testified that a case plan was implemented in 2009 and modified several times thereafter; Hosier testified that she had reviewed the requirements of the case plan with Mother, in detail, many times. The initial case plan called for Mother to have a steady income and stable housing, to attend the children's appointments, to comply with the recommendations of her mental health provider, to attend therapy, to participate in visitation, and to refrain from physical discipline of the children. Mother's compliance with these requirements was mixed. She had a steady full-time job at Waffle House, but Hosier questioned Mother's assertion that this income was sufficient to meet her needs and the needs of the children. In these conversations, Mother indicated that she relied on her fiance's income (later her husband) to cover any shortfall, but

the couple never provided documentation of the fiance's income, and Hosier noted that his presence at the home at all times of the day seemed inconsistent with their claims that he was working. Mother's attendance at E.C.'s appointments and visitation was spotty in 2012, but was more consistent in early 2013. Mother attended therapy, but did not seem invested in it; she would ask the therapist questions such as whether they could conduct the sessions by phone and what would happen if she (Mother) failed to attend. Hosier expressed concern that Mother attended therapy only because MCCS required it, rather than because she recognized the need for it or how she could benefit from it.

{¶ 19} During the course of MCCS's involvement with E.C., additional requirements were added to the case plan. After the suspected incident of domestic violence between Mother and her husband in January 2013, Mother was required to avoid exposing the children to violence, to attend domestic violence education and marriage counseling, to complete an Artemis Center program and anger management training, and to attend additional therapy of a different type. Mother did complete many, but not all, of the additional requirements of the case plan.

{¶ 20} Hosier expressed her opinion that Mother did not take responsibility for many of her actions or the issues with which she struggled. Hosier also believed that Mother was "consistently dishonest about things that have happened throughout this case." Hosier testified that E.C. was doing very well in her foster home, where she had lived since she was three days old. Hosier and the foster mother testified that E.C. had a close bond with the foster family and that the family was interested in adopting E.C.

{¶ 21} The guardian ad litem, who had been involved with Mother's family for

several years, testified that Mother had completed or was making an effort to complete all of the objectives of the case plan. She also testified to having frequent communication with Mother, during which Mother would bring to the guardian ad litem's attention any struggles she was having with compliance. In her reports, the guardian ad litem had been advocating, unsuccessfully, for the children to have more visitation with Mother to help with their transition back into her home, and she viewed many of MCCS's concerns as "speculative" in light of the limited time (4 hours per week) that Mother spent with E.C. The guardian ad litem believed that, if Mother were permitted to spend more time with E.C. and her other children, many of MCCS's concerns about how Mother would handle various situations could be alleviated; "there hasn't been a lot of opportunity to show whether she's able to handle the kids in the house at this point."

**{¶ 22}** The guardian ad litem also testified that Mother "made a lot of effort" toward completing her case plan objectives, relative to other parents she has seen "in these situations." The guardian ad litem acknowledged, however, that, at the time of the hearing, MCCS did not have the option of further extending temporary custody. The guardian ad litem reluctantly stated that, with respect to E.C., if "today the only option is you immediately go back to your mom's care or you stay in your foster home, I would have to say she stays in her foster home, because I can't say that would be in her best interest to pull her out without some type of a transitional period of time for her to get in a relationship more with her mom."

**{¶ 23}** Mother testified that she wanted E.C. to live with her and that she was ready to take on that responsibility. She claimed that MCCS had not provided her with all of the

assistance (such as referrals and bus tokens) she needed to comply with the case plan and that MCCS had not had reunification as its goal during the period of temporary custody. She testified that she had trouble getting in touch with her caseworker, Hosier, and that she felt "bullied" by Hosier. Mother also asserted that she had told Hosier about several important developments in her life, such as her impending marriage and her need for surgery, but Hosier had subsequently acted like she did not know anything about these events. Mother also claimed to have sent pay stubs to Hosier in the mail, which Hosier denied having received. Mother claimed that these types of issues existed "[t]he whole duration of [her] case." She described numerous other shortcomings of and frustrations with MCCS's handling of her case. Mother also stated that she had provided to Hosier names of several relatives who might be able to take custody of E.C.; she claimed that MCCS did not investigate the possibility of placements with some of these relatives.

{¶ 24} MCCS recalled Hosier to rebut or further explain many of Mother's assertions. For example, Hosier described the manner in which she had attempted to communicate with Mother throughout the case, by phone, voice messages, and, if those were unsuccessful, by mail. Hosier provided copies of letters she had sent to Mother about assessments, appointments, and case plan objectives. Hosier claimed that Mother had provided names of two relatives as possible placements, but that these relatives were ineligible; a home study and/or prior involvement with MCCS eliminated one of the relatives, and the other did not express an interest in caring for E.C. Hosier denied that the names of the other relatives had been provided previously. Hosier found it "very concerning" the extent to which Mother was untruthful at the hearing about communications, referrals, and

other assistance that had been offered by MCCS and others, but added that this dynamic had been "ongoing" in the case.

{¶ 25} Mother had completed some case plan objectives and had made progress toward the completion of others, but several items in Mother's case plan were incomplete after she had worked on the plan for two years, and the unresolved issues related to the cause of E.C.'s removal. The trial court observed that Mother "continues to struggle with an ability to put the best interest of the child before her own desires and feelings regarding those that are involved with her child." The court also noted that Mother's older children are in the custody of relatives and Mother had "not yet demonstrated the ability to provide care" for them, and had never cared for all three children. Although the guardian ad litem advocated for further extension of temporary custody, the court concluded that no further extensions were authorized by law. It also relied on the facts that no relatives were willing to take E.C. and that the foster family was interested in adopting her.

{¶ 26} Based on the evidence presented and the placement options available to it, we cannot say that the trial court abused its discretion when it concluded that MCCS had shown, by clear and convincing evidence, that E.C.'s best interest would be best served by granting permanent custody to the agency.

{¶ 27} The assignments of error are overruled.

{¶ 28} The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Michele D. Phipps
Cristy N. Oakes
Hon. Nick Kuntz