[Cite as *In re J.W.*, 2014-Ohio-2814.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

IN THE MATTER OF: J.W. and S.W.  :
               :
               :  Appellate Case Nos. 2013-CA-113 and
               :
               :  2013-CA-114
               :
               :  Trial Court Case No. 2012-915 and
               :
               :  2012-916
               :

               (Appeal from Common Pleas Court-
                Domestic Relations)

. . . . . . . . . . .

O P I N I O N

Rendered on the 27th day of June, 2014.

. . . . . . . . . . .

RYAN A. SAUNDERS, Atty. Reg. No. 0091678, Clark County Family and Children Services, 50 East Columbia Street, 4th Floor, Springfield, Ohio 45502
   Attorney for Appellee-Clark County Family and Children Services

DARRELL L. HECKMAN, Atty. Reg. No. 0002389, One Monument Square, Suite 200, Urbana, Ohio 43078
   Attorney for Appellant-J.S.

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, 131 North Ludlow Street, Suite 1210, Dayton, Ohio 45402
   Attorney for Appellant-S.W., Sr.

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}     In this case, J.S. and S.W., Sr. appeal from the termination of their parental rights regarding their two minor children, J.W. and S.W., who were ages eight and 10, respectively, when the parental rights were terminated.    The parents have each filed briefs, and have listed separate assignments of error.   However, both parents contend that the trial court erred in finding that it was in the children's best interests for permanent custody to be granted to Appellee, Clark County Family and Children Services (CCFCS), and that the trial court erred in failing to appoint counsel for the children.   In addition, J.S. contends that the trial court unconstitutionally penalized the parents for their poverty, and that the court erred in finding that it had jurisdiction or legal authority to grant permanent custody to CCFCS.

{¶ 2}     We conclude that the trial court did not err in awarding permanent custody to CCFCS.   The trial court carefully considered all appropriate factors, and its decision is supported by clear and convincing evidence in the record.   The trial court also did not err in failing to appoint counsel for the minor children.   Counsel need only be appointed in certain circumstances, and counsel is not required where, as here, references to a desire to reunify are a child's only occasional expression of a wish to be with a parent.

{¶ 3}     We further conclude that the trial court did not unconstitutionally penalize the parents for their poverty.   Instead, the parents chose to spend their money staying in hotels rather than for housing for the children.   The parents also failed to comply with even the most minimal requirements of their case plan.   Finally, the trial court based its findings on R.C.

2151.414(B)(1)(a), not on R.C. 2151.414(B)(1)(d), as J.S. contends, and there is no need to consider arguments as to legal authority under the latter subsection of the statute.

{¶ 4}     Accordingly, the judgment of the trial court will be affirmed.


I.   Facts and Course of Proceedings

{¶ 5}     In July 2012, CCFCS filed a complaint in the Clark County Common Pleas Court, Domestic Division, Juvenile Section, requesting that it be granted temporary custody of J.W. and S.W., who were then ages 7 and 9, respectively.   The complaint alleged that the family was living in a basement that was totally inappropriate, being very wet, dirty, unsafe, with poor lighting, trash, and piles of miscellaneous items throughout the area.   The children were found to be very dirty, and there were concerns about food supplies.   According to the complaint, J.S. had been arrested for child endangerment in 2003, 2009, and 2010, and had been found guilty of the charges from 2009 and 2010.   CCFCS also had previous involvement with the family in 2003, and from 2006-2010.

{¶ 6}     In addition, the complaint detailed the children's absences from school and suspensions.   Both children had special needs at the time of removal from their home.   Both children had mental issues, including ADHD and episodic disorder, were on IEPs at school, and were on medication.   While under their parents' care, they had missed significant amounts of time in school.

{¶ 7}     On July 27, 2012, the parents appeared in court and admitted that the children were dependent. They agreed that the maternal grandmother, T.C., should have temporary custody for six months.

{¶ 8} The case plan for the family indicated that the family had a history of instability regarding housing, and the children had been removed before for lack of running water, electricity, or heat. Specifically, in 2007, CCFCS became involved with the family based on an abuse referral. Although the abuse was unsubstantiated, the family was homeless. J.S. was also reportedly using drugs, and the children were placed with T.C., on a safety plan. That particular case plan was open from June 2007 to January 2009. After the parents obtained housing, the plan was closed. However, the parents were evicted shortly after the plan was closed.

{¶ 9} In September 2009, the police removed the children from the home, based on a lack of electricity and running water. The children were again placed with T.C. J.S. was charged with two counts of child endangering and was convicted of one. Subsequently, in July 2010, CCFCS had a referral that the family was living in a hotel, and that J.S. was jaywalking with J.W. on Main Street, walking too close to cars. J.S. was again charged with and convicted of one count of child endangering. CCFCS gave the family funds to pay the rent for a trailer, but the family was evicted one month later for non-payment of rent. Then, in 2012, there was the latest referral, regarding living in the basement, which was wet and unsanitary. In addition, the family was using a bucket as their only toilet.

{¶ 10} In order to be reunited safely with the children, the parents were required to obtain housing and provide proof of income. They also needed to have drug and alcohol assessments and follow through with any recommendations, and to have mental health assessments and follow through with any recommendations. These requirements were initially made in June 2012, shortly after the children were removed. Both parents agreed to the recommendations, and understood what was required. The parents were also given referrals to address the agency's concerns.

{¶ 11} The parents did obtain housing in October 2012, but an eviction action was filed on December 31, 2012, due to non-payment of rent. This was consistent with the parents' history of obtaining housing for a brief period and then being evicted.

{¶ 12} In January 2013, CCFCS filed a motion with the court, requesting that it be awarded temporary custody. T.C. had requested that the children be removed from her home due to their behaviors, particularly those of S.W., who had serious behavior issues. There were also concerns of drug abuse regarding the parents, who had both tested positive for opiates at a custody hearing on January 15, 2013. Drug concerns about J.S. had also been present throughout her history with CCFCS. In 2007, J.S. had been recommended for Women's Recover, a residential facility, but did not complete treatment. J.S. had also previously been at Talbott Hall, a detoxification facility.

{¶ 13} The trial court granted temporary custody to CCFCS, and the children were placed together in a foster home. However, S.W. was moved to a different foster home three months later, due to his violence against J.W. and the foster mother. After being placed in a new foster home in Xenia, Ohio. S.W. did well there.

{¶ 14} In August 2013, CCFCS filed a complaint and motion asking the court to modify the temporary custody to permanent custody to CCFCS. The request was based on a number of items, including the parents' failure to remedy the problems causing placement of the children outside the home. A guardian ad litem (GAL) that had been appointed filed a report indicating that the parents had not been able to provide for any of the needs of their children, had not participated in the case plan, and had not accomplished any of the goals of the case plan. The GAL strongly recommended that the court grant the request for permanent custody.

{¶ 15} The GAL filed another report in October 2013, again recommending that the

court grant CCFCS's request for permanent custody. The GAL noted that he had interviewed the children, and that they strongly wished to be reunited as a family. However, the GAL also expressed the belief that, based on the children's counseling diagnosis, disabilities, and learning disabilities, the children did not understand the long-term consequences of their desire to reunify. In particular, S.W. had learning disabilities and was in the low to low average for his age group. S.W. had been in four school systems in the past few years, and needed stability to be successful at learning. The parents had no place to live, nor did they have furniture or appliances. Their work was sporadic and both parents were very thin, looking as if they did not eat regular meals. The GAL concluded that while the parents loved their children, they were not able to provide for themselves or their children, and the parents' circumstances were not likely to change in the near future. The GAL also filed a further comment on November 4, 2013. In this report, the GAL observed that a final custody hearing had been scheduled for Friday, October 24, 2013. All relevant persons appeared at the hearing, other than the parents, who reported by cell phone that they were en route to Columbus, Ohio, for emergency medical treatment because the father, S.W., Sr., was throwing up blood. However, the parents then claimed they had run out of cell phone minutes and could only use text messages. The GAL indicated the report was untrue, and that the father had gotten T.C. to take him to the emergency room in Springfield, Ohio. The GAL criticized the parents for using poor judgment with respect to failing to use the limited cell phone minutes to call the emergency squad, and for possibly attempting to delay the trial, which showed a lack of respect for their children, who needed stabilization.

{¶ 16} According to the record, S.W., Sr. was able to attend a Saturday visitation with the children, after not being able to attend court the day before. The parents had a schedule of

weekly visitation at a visitation center, on Saturdays from 9:00 to 11:00 a.m. They had been generally consistent with visitation, and the supervisor in charge of the visitations indicated that the parents and children had a close bond and interacted appropriately with each other. However, from the time that visitations were initially scheduled, the parents never asked CCFCS for increased visitation until October 2013, shortly before the final custody hearing. At that point, CCFCS refused, since the agency had already filed for permanent custody.

{¶ 17} The second hearing on the permanent custody motion was scheduled for November 4, 2013. At 9:25 a.m., the trial court indicated on the record that the trial was supposed to begin at 9:00 a.m., and the parents had not yet arrived. The father's attorney stated that the parents were presently in Beavercreek, Ohio, waiting for a bus that was supposed to come at 9:30 a.m. and arrive in Springfield, Ohio, (the location of the trial), at 10:15 a.m. The court noted that the bus was leaving a half-hour after trial was supposed to begin, and the attorney explained that this was the first bus the parents could find after allegedly realizing that their ride to court was not coming. The court then began the trial. Ultimately, J.S. showed up at about 11:30 p.m., but the children's father never appeared. J.S. had no explanation as to why he did not appear, other than that he was supposed to be getting a ride.

{¶ 18} At trial, the State presented evidence from two CCFCS caseworkers who detailed the deplorable conditions in which the children had been found and the utter failure of the parents to comply with the case plan requirements. The only thing that the parents had accomplished in more than a year was to attend most of the weekly two-hour visitations with their children. The parents did belatedly go for mental health evaluations in October 2013, around two weeks before the initial permanent custody hearing. However, they stated in their

assessment that they were only at the mental health facility because they wanted to reunify with their children. They also both declined any treatment.

{¶ 19} Both caseworkers indicated that the best interests of the children would be served by placing permanent custody with CCFCS. The children were adoptable, and J.W.'s foster parent was interested in adopting him. The caseworkers acknowledged that the children loved their parents, but stressed that the parents could not meet the children's needs; in fact, the parents could not even meet their own needs. Denise Bell, the original caseworker, stated that she had pleaded with the parents to complete the case plan requirements, and they would not. The parents kept telling her that they had appointments scheduled, and when she checked with the particular facility, the parents had not gone to the appointments. In addition, the parents would tell her that S.W., Sr. was working when he was not. Bell attributed it to the parents' drug use and the fact that they just wanted to continue to use drugs. For years, the family's situation had been one of instability, and the parents had never demonstrated that they could provide for their own needs, let alone those of the children.

{¶ 20} J.S. testified at the hearing. She stated that she and S.W., Sr. did not have a current address. J.S. claimed that they had just found a house, but it would be two weeks before they could move in. However, she brought no proof to court to show that they had obtained housing. J.S. also brought no proof of income, other than a few receipts showing minimal amounts earned in what appears to be: January 2013 ($330 total for J.S. and S.W., Sr.); August 21, 2013 ($800 for S.W., Sr.); and September 3 and 4, 2013 ($495 for S.W., Sr.). *See* Joint Ex. B. There were three other undated documents that list work done or anticipated to be done on two other houses, two of which list amounts totaling $2,350. *Id.* J.S. indicated that she and

S.W., Sr. had been working for a contractor since April 2013, and had traveled around working on houses while staying in motels. The night before the hearing, they had stayed in a hotel in Beavercreek, Ohio, that had cost $60 per night. When they were not traveling, they stayed in the Executive hotel in Springfield, Ohio, which cost $40 per night.

{¶ 21} Some of J.S.'s testimony was contradicted by evidence in the record. For example, she claimed that she and S.W., Sr. had two appointments at Wellspring in April 2013, but when they went, identification was needed. WellSpring apparently gave them a week to try and find identification, but they were not able to do so in time. However, the records from WellSpring indicate that both parents had appointments scheduled for April 3, 2013, and April 10, 2013. The parents cancelled the first appointment, and did not show or call to cancel the second appointment.

{¶ 22} In another example. J.S. testified that the rent at the apartment they did obtain in October 2012 was about $600 per month, when the records at CCFCS indicate that the rent was $375 per month. Still another example of a lack of credibility is the fact that J.S. reported on her mental health evaluation that she had no drug or alcohol usage and no addictive behaviors. See State's Ex. C. In contrast, J.S. admitted during her testimony that she does have an alcohol and drug use history, and had received treatment in 2004 for OxyContin (opiates).

{¶ 23} After hearing the testimony, the trial court granted CCFCS's motion for permanent custody. The court concluded that the children could not be placed with either parent within a reasonable time or should not be placed with either parent because the parents had failed to remedy the problems that had caused their removal, and had demonstrated a lack of commitment and dedication to the children by regularly failing to support them. The court

additionally concluded that it was in the best interests of the children for permanent custody to be given to CCFCS. Both parents appeal from the decision terminating their parental rights.

## II. Did the Trial Court Err in Granting Permanent Custody to CCFCS?

{¶ 24} Because the parents' separate briefs raise some of the same issues, we will consider these assignments of error together. For convenience, we will also consider the assignments of error out of order. J.S.'s Second Assignment of Error states that:

The Trial Court Erred in Finding that It Was in the Best Interests of the Children that They Be Permanently Taken Away from Their Parents in that Such Finding Was Against the Manifest Weight of the Evidence.

{¶ 25} Similarly, S.W., Sr.'s First Assignment of Error states as follows:

The Trial Court Committed Reversible Error in Granting Permanent Custody to Family and Children's Services of Clark County, as the Agency Failed to Prove by Clear and Convincing Evidence that Permanent Custody was in the Best Interest of the Children.

{¶ 26} In arguing that the court's decision is against the manifest weight of the evidence, or was not supported by clear and convincing evidence, the parents both focus on two factors under R.C. 2151.414(D)(1) – (a) that the court should consider the interactions between the child's parents, siblings, and relatives before making a permanent custody decision; and (b) that the court should consider the children's wishes. The parents argue that these factors strongly weigh in their favor.

{¶ 27} "The United States Supreme Court has recognized that parents' interest in the

care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized' by the court." *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 12, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). " * * * [P]arents who are 'suitable' persons have a 'paramount' right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children." (Citation omitted.) *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977).

{¶ 28}     Nonetheless, juvenile courts have broad discretion in choosing alternatives for the disposition of abused, neglected, or dependent children. *In re L.C.*, at ¶ 13, citing R.C. 2151.353(A) and Juv.R. 29(D). " 'In choosing among the alternatives, the best interest of the child is the court's primary consideration. Furthermore, in making its dispositional order, the court must consider which situation will best promote the "care, protection, and mental and physical development" of the child with the understanding that the court should separate a child from his family environment "only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A).' " *Id.*, quoting *In re C.W.*, 3d Dist. Wyandot No. 16-09-26, 2010-Ohio-2157, ¶ 11.

{¶ 29}     In this regard:

R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that (1) granting permanent custody of the child to the agency is in the best interest of the child and (2) either the child (a) cannot be placed with either parent within a

reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period.

*In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8, citing R.C. 2151.414(B)(1).

**{¶ 30}** The court's findings "must be supported by clear and convincing evidence," and "the children services agency has the burden of proof." (Citations omitted.) *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, at ¶ 14.

**{¶ 31}** Under R.C. 2151.414(D), the trial court must "consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15.

**{¶ 32}** Our review of the trial court's decision is for abuse of discretion. *In re E.C.*, 2d Dist. Montgomery No. 25944, 2014-Ohio-1660, ¶ 11 (Citation omitted.) "An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable."

(Citations omitted.)    *Id.*    We have also said that "[a] reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' " *In re R.L.,* 2d Dist. Greene Nos. 2012CA32, 2012CA33,  2012-Ohio-6049, ¶ 17, quoting *In re A.U.*, 2d Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9.    In addition, "[n]ot every statutory condition must be met before a determination regarding best interest may be made. * * * And no one statutory factor is more important than any other."   (Citations omitted.) *In re R.L.*, at ¶ 18, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶ 33}    After examining the entire record, including the exhibits, we cannot say that the trial court's decision was unreasonable, arbitrary, or unconscionable.   The trial court's decision was also supported by competent, credible, clear, and convincing evidence.

{¶ 34}    As was noted above, the parents were unwilling, for approximately sixteen months, to make any effort that would allow them to reunify with their children, other than visiting the children for a few hours once a week.   By J.S.'s own admission, she was not employed at all between July 2012 and April 2013, and was employed only sporadically after that.   Likewise, S.W. Sr.'s employment was somewhat sporadic.   Yet, during all these months, the parents failed to appear for a single mental health appointment except one scheduled on the eve of trial, in which they indicated that they had no problems other than being required to have an assessment for reunification purposes, and further indicated that they did not desire treatment. They also failed to take minimal steps to secure drug and alcohol evaluations or to obtain

housing.

{¶ 35}   In addition, the children were living in deplorable conditions before they were removed, and the instability had continued for many years.   Both children had special needs that were not being met – they had many absences from school while in the parents' care and were significantly delayed in academic skills.   S.W., in particular, had severe behavior issues.   After removal, both children were doing well in their foster care environments, and had improved substantially in their progress and attendance at school.   While the children may have at one point expressed a natural wish to reunite with their parents, the record demonstrates that this would be very detrimental to their welfare.   The GAL additionally expressed the opinion that the children were not capable of understanding the long-term consequences of their desire to reunify as a family, due to their counseling diagnosis, disabilities, and learning disabilities.   This opinion is also supported by the record.   The trial court was not required to place emphasis on the children's wishes or the relationships among the family, to the exclusion of all other factors.

{¶ 36}   Accordingly, the trial court did not err in concluding that permanent custody to the agency was in the children's best interests.   The court carefully considered all factors, and its decision is supported by clear and convincing evidence in the record.   J.S.'s Second Assignment of Error and S.W., Sr.'s First Assignment of Error are without merit and are overruled.

III.   Did the Trial Court Err in Failing to Appoint an Attorney for the Children?

{¶ 37}   J.S.'s Fourth Assignment of Error and S.W., Sr.'s Second Assignment of Error state that:

The Trial Court Erred in Failing to Appoint Counsel for the Children.

**{¶ 38}** Under this assignment of error, the parents contend that the trial court should have appointed counsel for the children because the GAL's recommendation was inconsistent with their wishes. In this regard, the parents rely on *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110. In *Williams*, the Supreme Court of Ohio held that in certain circumstances, children who are the subject of parental termination proceedings are entitled to counsel. *Id.* at syllabus. In response, CCFCS cites cases indicating that *Williams* does not apply unless the record demonstrates that a child has repeatedly and consistently expressed an affirmative desire to return to a parent's home. *See, e.g.*, *In re B.W.*, 9th Dist. Medina No. 12CA0016-M, 2012-Ohio-3416, ¶ 42.

**{¶ 39}** In *Williams*, the Supreme Court of Ohio considered the interplay of R.C. 2151.352, Juv.R. 4(A), and Juv.R 2(Y), and concluded that counsel must be appointed for a child in certain circumstances. The circumstances in *Williams* included that "[the child] had repeatedly maintained he wished to remain with [his mother]. His behavior regressed and became more aggressive upon his removal in October of 2001. During supervised visitation, [the child] often did not want to let [his mother] out of his sight." *In re Williams*, 11th Dist. Geauga Nos. 2002-G-2454, 2002-G-2459, 2002-Ohio-6588, ¶ 9 (*Wililams I*).

**{¶ 40}** The court of appeals noted in *Williams I* that every party in juvenile court is entitled to be represented by counsel, but "the court is only required to appoint counsel to represent the child's interests if there is an allegation of abuse." *Id*. at ¶ 19. The court of appeals further observed that:

If a juvenile court determines that a child is entitled to legal representation in addition to a guardian ad litem, the court can appoint an attorney to serve in the

dual capacity of appointed counsel and guardian ad litem. A dual appointment is permitted if there is no conflict between the roles. The separate appointment of counsel is necessary if there is a direct conflict between the recommendation of the guardian ad litem and the expressed wishes of the child. This is because the role of a guardian ad litem is different than that of an attorney. The role of the guardian ad litem is to investigate the child's situation and then ask the court to do what is in the child's best interest, while the role of an attorney is to zealously represent his client's wishes within the bounds of the law. If there is a conflict between these roles, the guardian ad litem may not be the child's attorney.

*Id.*

{¶ 41} In concluding that an attorney should have been appointed for the child, the court of appeals commented in *Williams I* that the child had "consistently expressed a desire to be reunited with [his mother]. Once, [the child] told his therapist he would move his house into the woods and live with [his mother] there if told he could not live with his mother." *Id.* at ¶ 20. The court of appeals also rejected the idea that appointment of counsel had been waived because no request for appointment of counsel had been made below. *Id.* at ¶ 21. Although the court recognized that other appellate courts had found waiver in similar situations, the court stated that:

We are reluctant to find waiver in a case where a child consistently has expressed a wish to be with a parent. Courts have stated that a child's interests are not represented by his or her parents, even when the parents and child all want reunification. To find waiver would deny that child his or her right to counsel because another party did not raise the issue.

This is not to say that every child should be given counsel or that waiver is not appropriate in certain cases. There is a question in this case as to whether six-year old [M.] has the maturity to understand the proceedings. Arguably, most children of tender years will want to be returned to their parents. A juvenile court need only consider a child's wishes regarding a motion for permanent custody after giving due regard to the child's maturity. R.C. 2151.414(D)(2). Similarly, there is no need to consider the appointment of counsel based upon a child's occasional expression of a wish to be with a parent or because of a statement made by an immature child.

Courts must consider each case on the facts presented as no bright-line rule can be imposed regarding what age a child would be considered mature for the purposes of the appointment of legal counsel. Children and circumstances differ to a large degree such that the court must base its determination of whether or not legal counsel should be appointed on its consideration of the child at issue and not whether a certain age must be attained before the right to counsel attaches.

Indeed, in most cases, a child of tender years will probably lack the maturity to understand the situation and consequences involved in a permanent custody case. We are not requiring that legal counsel be appointed every time a child states a desire to remain with a parent. However, when a child consistently expresses a desire to be with a parent, then a juvenile court should investigate, giving due regard to the child's maturity and understanding of the proceedings,

and make a ruling about whether an attorney should be appointed to represent the child's interest and expressed wishes.

*Williams*, 11th Dist. Geauga Nos. 2002-G–2454, 2002-G-2459, 2002-Ohio-6588, at ¶ 23-26.

**{¶ 42}** Based on the above discussion, the court of appeals reversed and remanded the case. On remand, the trial court appointed an attorney for the child, but the attorney's role was limited to filing a response to the permanent custody motion "stating the position of the child with respect to permanent custody." *In re Williams*, 11th Dist. Geauga Nos. 2003G-2498, 2003-G-2499, 2003-Ohio-3550, ¶ 8 (*Williams II*). Furthermore, while the juvenile court had originally scheduled a re-hearing on the motion for permanent custody, the court issued a decision concluding that appointment of an attorney was not necessary. The court then reinstated its prior decisions as to permanent custody without holding a hearing. *Id.* at ¶ 9.

**{¶ 43}** On further appeal, the court of appeals reversed again, concluding that this cursory process did not protect the child's rights. *Id.* at ¶ 18. The Supreme Court of Ohio subsequently certified a conflict in *Williams II* on the issue of "[w]hether children who are the subject of a motion to terminate parental rights are 'parties' to that proceeding for the purposes of Juv.R. 4(A) and R.C. 2151.352, requiring the appointment of counsel." *In re Williams*, 99 Ohio St.3d 1540, 2003-Ohio-4671, 795 N.E.2d 680 (Table). The conflict case was *In re Alfrey*, 2d Dist. Clark No. 01CA0083, 2003-Ohio-608. As was noted, the Supreme Court of Ohio ultimately concluded that under R.C. 2151.352 and the Ohio Juvenile Rules, children were "parties" to the proceeding and would be entitled to counsel under certain circumstances. *Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, syllabus. However, the court did not specifically detail what circumstances would give rise to the need to appoint counsel.

**{¶ 44}** Courts applying *Williams* have noted that "there is no need to consider the appointment of counsel based upon a child's *occasional* expression of a wish to be with a parent or because of a statement made by an immature child." (Emphasis sic.) *In re B.S.*, 5th Dist. Tuscarawas No. 11AP100041, 2012-Ohio-1036, ¶ 33, citing *Williams I*, 11th Dist. Geauga Nos. 2002-G-2454, 2002-G-2459, 2002-Ohio-6588, at ¶ 24. For example, in the case of *In re B.S.*, a letter from the child's counselor indicated that the child was "grieving the loss of Father 'especially', and wanted to go home." *Id.* at ¶ 34. At the time, the child was five years old. *Id.* at ¶ 35. The Fifth District Court of Appeals also stressed that "[t]he *Williams* Court emphasized the child expressed his wish for reunification 'often,' 'consistently,' and 'repeatedly.' " *Id.* at ¶ 33, quoting *Williams I* at ¶ 17, 20, and 9.

**{¶ 45}** In rejecting the need for appointment of a separate attorney, the Fifth District Court of Appeals observed that "the counselor's general expression of the girl's emotions does not equate to the child's ability to make a knowing choice to remain with one parent. The counselor also noted B.S. was open to being loved by another mother and father." *Id.* at ¶ 36.

**{¶ 46}** In the case before us, the GAL indicated that he had interviewed J.W. and S.W., and that "[t]hey wish as strongly as it is possible for them to wish that they could be reunited as a family." Doc.# 62, p. 1. The rest of the record does not reveal any comments from J.W. regarding a wish to be reunited. With respect to S.W., the notes for his counseling records contain a few references to S.W.'s sadness that he would not be reunited with his parents. State's Exhibit K, notes for 7/8/2013, 8/26/13, and 10/2/2013.

**{¶ 47}** However, these were only occasional references to the state of S.W.'s emotions, and do not rise to the level of demonstrating that "the child has repeatedly and consistently

expressed the affirmative desire to return to the parent's home." *In re B.W.*, 9th Dist. Medina No. 12CA0016-M, 2012-Ohio-3416, at ¶ 42. Moreover, in contrast to the child in *Williams*, S.W. and J.W. did not regress in behavior after their removal from the home. S.W. had some behavior issues initially, but these were no different from the issues he had while living with his parents. Furthermore, S.W.'s behavior improved significantly after he was placed in a second foster home. We recognize that this is a close issue, and if some of the facts had been different, the trial court may have erred by failing to appoint an attorney for the children.

{¶ 48} In view of the above discussion, we conclude that the trial court did not err in failing to appoint counsel for the children. We also note that some courts have held that a parent waives the right to challenge the lack of appointment of counsel for a child by not raising the matter in the trial court. *See, e.g.*, *In re N.G.*, 9th Dist. Lorain No. 12CA010143, 2012-Ohio-2825, ¶ 16-17. The rationale is that parents should not be permitted to impose belated challenges in order to delay custody proceedings, which are expedited in order to prevent children from languishing in the foster care system. *Id.* at ¶ 17. We do not rely on the doctrine, but note that authority does exist for application of waiver. If we were required to apply the waiver doctrine, we would find no plain error that would warrant reversal.

{¶ 49} Based on the preceding discussion, J.S.'s Fourth Assignment of Error and S.W., Sr.'s Second Assignment of Error are overruled.

### IV. Were the Parents Penalized Due to Poverty?

{¶ 50} J.S.' s Third Assignment of Error states that:

The Trial Court Erred in Finding that the Parents Lost Their Constitutional

Right to Custody of Their Children.

{¶ 51} Under this assignment of error, J.S. contends that she was unconstitutionally deprived of custody of her children because she is destitute. According to J.S., poverty is often mistaken for neglect. As an example of her poverty being an inhibiting factor, J.S. points to the fact that on the day of the hearing, she had only $10.00 in her pocket and expended $9.50 on a bus to get to the hearing.

{¶ 52} We have already stressed that a parent's interest in the care, custody, and control of children is a fundamental liberty interest. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, at ¶ 12, quoting *Troxel*, 530 U.S. at 65, 120 S.Ct. 2054, 147 L.Ed.2d 49. However, poverty is not the reason that J.S. and S.W., Sr. were deprived of their parental rights. Their parental rights were terminated because they made no effort, for a period of 16 months, to comply with the most simple requirements of their case plan. If the parents were truly concerned about their children's welfare, they would have attempted to comply. Furthermore, the parents had sufficient income to live in hotels, expending several hundred dollars a month, by J.S.'s own account, when that money could have been used to obtain housing for the children.[1] The night before the hearing, the parents spent $60 on a hotel room – and chose to stay in Beavercreek, Ohio, rather than in Springfield, where they would have been more easily able to travel to the important hearing that would determine the fate of their children. This is not a matter of poverty; it is a matter of poor judgment and inattention to the needs of the children.

{¶ 53} Based on the preceding discussion, J.S.'s Third Assignment of Error is

---

[1] At the rate of $40 per night cited by J.S., about $1,200 would have been expended each month for hotels. J.S. indicated that when they could afford to pay weekly, the rate was $150. Even at that rate, $600 would have been expended on hotels.

overruled.

### V.  Did the Trial Court Err in Finding Legal Authority to Grant Custody?

{¶ 54}    J.S.'s First Assignment of Error states that:

The Trial Court Erred in Finding it Had Jurisdiction or Legal Authority to Grant Permanent Custody of the Children to the Clark County Department of Family and Children Services.

{¶ 55}    Under this assignment of error, J.S. contends that the trial court lacked jurisdiction or legal authority to grant permanent custody to CCFCS because the children had not been in the custody of one or more public children services agencies for 12 or more months of the preceding 22 months, as required by R.C. 2151.414(B)(1)(d).  J.S. bases her argument on the fact that the CCFCS only received temporary shelter care custody on January 15, 2013, and temporary custody on February 8, 2013.  In her reply brief, J.S. concedes that CCFCS properly stated alternate grounds for custody in its complaint, based on R.C. 2151.414(B)(1)(a).

{¶ 56}    We note that the trial court did not rely on R.C. 2151.414(B)(1)(d) in its decision.  Instead, the court concluded that the children could not be placed with the parents within a reasonable period of time or should not be returned to the parents.  Doc.# 68, Judgment Entry, p. 5.  This was consistent with R.C. 2151.414)(B)(1)(a), which states that:

Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to

the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶ 57}** Because this ground was raised in the complaint for custody, and was relied on by the trial court, any issues relating to R.C. 2151.414(B)(1)(d) are irrelevant. Accordingly, J.S.'s First Assignment of Error is overruled.

## VI.  Conclusion

**{¶ 58}** All of J.S.'s and S.W. Sr.'s assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J., concurs.

FAIN, J., dissenting.

{¶ 59} Although I agree with Judge Welbaum's opinion for this court in all other respects, I would find some merit to the mother's fourth assignment of error and the father's second assignment of error, both of which concern the trial court's failure to have assigned counsel for the children.

{¶ 60} In *In re Williams*, 110 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, ¶ 29, the Supreme Court of Ohio held that: "a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." In that portion of the Supreme Court's opinion addressed to the issue on appeal, the Court provided no guidance concerning what "certain circumstances" will trigger the child's right to independent counsel, beyond its recognition that courts of appeals have "recognized that courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child." *Id.*, ¶ 17.

{¶ 61} The Supreme Court did cite, in the portion of its opinion dealing with the procedural history of the case, at ¶ 6, the following passage in the opinion of the Eleventh District Court of Appeals in the first appeal in that case: "[W]hen a child consistently expresses a desire to be with a parent, then a juvenile court should investigate, giving due regard to the child's maturity and understanding of the proceedings, and make a ruling about whether an attorney should be appointed to represent the child's interest and expressed wishes." *In re Williams*, 11th Dist. Geauga Nos. 2002-G-2454 and 2002-G-2459, 2002-Ohio-6588, ¶ 26.

{¶ 62} The only place in that opinion where the court of appeals refers specifically to the

child's expression of his desire to be with his mother is at ¶ 20: "In the instant case, [the child] consistently expressed a desire to be reunited with appellant. Once, [the child] told his therapist he would move his house into the woods and live with [his mother] there if he could not live with his mother. That same therapist stated [the child] would be happier with [his mother]." Later, at ¶ 22, the court of appeals cited with approval the holding of the Eighth District Court of Appeals in *In re Clark*, 141 Ohio App.3d 55, 2001-Ohio-4126, 749 N.E.2d 833, "that children were entitled to legal representation in a case where one of the children expressed a strong desire to be returned to his mother at the dispositional hearing." (Quotation is from *In re Williams*.)

{¶ 63} I conclude that it is the strength of the child's expressed wish and its unequivocal character that, combined with the age of the child, informs the decision whether there are "certain circumstances" requiring the appointment of independent counsel for the child. The frequency with which the child's wish is expressed may be a factor in determining the strength of the wish, but I do not regard the multiplicity of a child's expressions of a wish to be reunited with a parent as an independent requirement for the appointment of counsel. After all, the child cannot "make a record" of multiple expressions of the child's desire.

{¶ 64} In the case before us, the guardian ad litem, who had interviewed the children, said that "[t]hey wish as strongly as it is possible for them to wish that they could be reunited as a family." The older child was almost eleven at the time of the hearing; the younger child was eight. They were not incapable of having meaningful desires concerning their own placement.

{¶ 65} In my view, the trial court should at least have conducted some further inquiry to determine whether independent legal representation of the children was warranted. To that extent, I would sustain the respective assignments of error of the mother and father pertaining to

this issue, reverse the permanent custody award, and remand this matter to the trial court for further proceedings.

Copies mailed to:

Ryan Saunders
Darrell L. Heckman
Jeffrey T. Gramza
Hon. Joseph N. Monnin