[Cite as *In re C.Z.*, 2025-Ohio-1699.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

IN RE:

    C.Z.,

**ADJUDICATED DEPENDENT CHILD.**

[AARON Z. - APPELLANT]
[DESTANY H. - APPELLANT]

**CASE NO. 10-24-04**

**OPINION AND
JUDGMENT ENTRY**

IN RE:

    H.Z.,

**ADJUDICATED DEPENDENT CHILD.**

[AARON Z. - APPELLANT]
[DESTANY H. - APPELLANT]

**CASE NO. 10-24-05**

**OPINION AND
JUDGMENT ENTRY**

IN RE:

    M.Z.,

**ADJUDICATED DEPENDENT CHILD.**

[AARON Z. - APPELLANT]
[DESTANY H. - APPELLANT]

**CASE NO. 10-24-06**

**OPINION AND
JUDGMENT ENTRY**

**Appeals from Mercer County Common Pleas Court
Juvenile Division
Trial Court Nos. 3-2022-047, 3-2022-048 and 3-2022-049**

**Judgments Affirmed**

**Date of Decision: May 12, 2025**

**APPEARANCES:**

*Darin Avery* **for Appellant Destany H.**

*Thomas J. Lucente, Jr.* **for Appellant Aaron Z.**

*Rebecca S. King Newman* **for Appellee**

**WALDICK, P.J.**

**{¶1}** Mother-appellant ("Mother"), and father-appellant ("Father"), bring these appeals from the September 25, 2024 judgments of the Mercer County Common Pleas Court, Juvenile Division, granting permanent custody of C.Z., H.Z. and M.Z. to the Mercer County Department of Job and Family Services ("MCDJFS"). On appeal, both parents argue that the trial court erred by granting permanent custody of the children to MCDJFS. Separately, Mother argues that the trial court erred by failing to make required findings pursuant to R.C. 2151.4117. Father also argues that the trial court erred by failing to consider less restrictive alternatives before terminating parental rights. For the reasons that follow, we affirm the judgments of the trial court.

*Background*

**{¶2}** Mother and Father have been in an on-again, off-again relationship since they were in middle school. They have had three children together: M.Z., born in July of 2018, H.Z., born in March of 2020, and C.Z., born in March of 2021.

**{¶3}** On August 3, 2022, the Coldwater Police Department received a report that the children, all under four years old, had been outside, unsupervised, for approximately forty minutes. One child was not wearing pants or underwear. Another child was wearing a dirty diaper that sagged nearly to his ankles. None of the children had shoes on and there was a "big wheel bicycle in the middle of the street" that belonged to the children.

**{¶4}** When law enforcement responded to the residence, the children were dirty, with dirty clothes. The residence itself was "unsafe," cluttered with trash and debris including some drug paraphernalia within reach of the children. In addition, there was food, food wrappers, dirty diapers, and dirty clothes scattered about the residence.[1] Mother was not home at the time and Father, who had been inside sleeping,[2] blamed the oldest child for the younger girls being outside. Father also tested positive for methamphetamine and THC while Mother tested positive for THC.

---

[1] While we have no photographs of the residence in the record, there was evidence presented that after nine months of attempting to "declutter" and "clean" the residence it was still not appropriate for the children, even after MCDJFS assisted in providing a dumpster for the residence.
[2] Father stated he had narcolepsy.

{¶5} Notably, on the weekend prior to this incident, Mother had contact with law enforcement due to having suicidal ideations. She was overwhelmed by caring for the children and MCDJFS became involved to provide "respite," taking the children for the weekend prior to this incident. At the end of the weekend the children were returned to Mother and Father, but only a few days later this incident occurred.

{¶6} On August 4, 2022, MCDJFS filed complaints alleging that the children were neglected and dependent children. On September 12, 2022, both parents admitted that the children were dependent as alleged and the allegation of neglect was dismissed. The cases proceeded to disposition on October 11, 2022, wherein the children were placed in MCDJFS's temporary custody and a case plan was adopted.

{¶7} For nearly two years the parents worked the case plan to varying degrees—Mother much more so than Father. MCDJFS assisted the parents throughout the case with the goal of reunification. In fact, during the pendency of the case MCDJFS provided the parents a total of $28,312.26 for things such as rent/back rent, exterminator services, utilities, gas cards, and cleaning supplies.

{¶8} On June 28, 2024, after the parents continuously failed to remedy the conditions that caused the children's removal, MCDJFS filed motions for permanent custody of all three children. A hearing was held on the motions on September 16, 2024, wherein thirteen witnesses testified, including numerous caseworkers,

counselors, and the parents of the children. The GAL that had been appointed for the children also filed a report recommending that MCDJFS's motions be granted.

{¶9} On September 25, 2024, the trial court filed judgment entries granting MCDJFS's motions for permanent custody of the children. In its final entries, the trial court summarized the evidence presented at the final hearing, then conducted a legal analysis of R.C. 2151.414. In one portion of its analysis, the trial court's entries quoted the GAL's report, which contained a succinct summary of the overall situation:

> After two years of services and assistance, [Mother and Father] have not been able to become independent, self-sufficient, and stabilized. They never reached the point where their progress was consistently positive. Although there were times where progress was good, something would always happen that would cause them to lose that forward momentum.

Ultimately the trial court determined that the children had been in the temporary custody of MCDJFS for twelve or more months of a consecutive twenty-two-month period, and that it was in the children's best interests that MCDJFS be granted permanent custody of the children.

{¶10} Both Mother and Father appeal the trial court's judgments, asserting, respectively, the following assignments of error for our review.

**Mother's First Assignment of Error**

**The trial court erred by failing to make the findings required under R.C. 2151.4117, or, alternatively, by granting the agency an exemption under R.C. 2151.4118.**

**Mother's Second Assignment of Error**

**The trial court erred in granting permanent custody to the agency.**

**Father's First Assignment of Error**

**The Trial Court erred in finding that the State proved by clear and convincing evidence that termination of parental rights was necessary.**

**Father's Second Assignment of Error**

**The Trial Court erred in failing to consider less restrictive alternatives before terminating parental rights.**

{¶11} Where appropriate, we will address assignments of error together, and out of the order in which they were raised.

*Mother's Second Assignment of Error; Father's First Assignment of Error*

{¶12} In Mother's second assignment of error, and in Father's first assignment of error, they argue that the trial court erred by granting MCDJFS's motion for permanent custody of the children.

Standard of Review

**{¶13}** The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 2003-Ohio-5885, ¶ 7 (3d Dist.). These rights may be terminated under appropriate circumstances when all due process requirements have been met. *In re Leveck*, 2003-Ohio-1269, ¶ 6 (3d Dist.).

**{¶14}** Revised Code 2151.414 sets forth specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child. *In re C.F.*, 2007-Ohio-1104, ¶ 22. Specifically, there are two separate elements that must be established by clear and convincing evidence: (1) one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) must apply[3]; and (2) granting permanent custody to an agency must be in the child's best interest. R.C. 2151.414(B)(1). If the trial court makes these statutorily required determinations, a reviewing court will not reverse a trial court's decision unless it is not supported by clear and convincing evidence. *In re H.M.K.*, 2013-Ohio-4317, ¶ 43 (3d Dist.).

---

[3] Neither parent is challenging the trial court's determination under the first prong of the permanent custody case. Even if either parent did make such a challenge, the evidence clearly and convincingly established that the children were in the temporary custody of the Agency for twelve or more months out of a consecutive twenty-two month period, satisfying R.C. 2151.414(B)(1)(d).

**{¶15}** When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

Relevant Authority

**{¶16}** Revised Code 2151.414(D)(1) sets forth a non-exhaustive list of factors the trial court must consider when determining whether granting a permanent custody motion is in the child's best interests. Revised Code 2151.414(D)(1) reads as follows:

> (D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.[4]

Evidence Presented

{¶17} Multiple MCDJFS caseworkers who were involved in this case testified at the final hearing. They detailed the services offered to the parents and the *substantial* assistance provided to the parents throughout the case.

{¶18} Testimony indicated that parents were required to take drug tests during the pendency of this case before engaging in visitation. Father had 106 positive drug screens and only 12 negative screens. Most of the positive drug screens were for marijuana. Mother got her medical marijuana card in April of 2023. Prior to that time, she had 53 positive drug screens and 2 negative.

{¶19} While the case was pending, Mother and Father separated for a time. Notably, Father was actually married to a woman in Indiana throughout the entirety of this case. He indicated he could not afford to get a divorce. By the time of the final hearing the parents were in a relationship again and living together. However,

---

[4] The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated.

their living situation could be described as fluid. Just prior to the final hearing, the parents had moved in with a "family-friend" who had a sizable residence. Neither parent was on a lease at the residence nor was there an agreement on how much the parents would pay in rent. Similarly there was no agreement regarding payment of utilities. MCDJFS had not been to the residence to inspect it.

{¶20} Testimony indicated that the children had been progressing positively in their placements. When the children were originally removed from the home, they displayed developmental/cognitive and/or speech delays. Testimony indicated that the three children all had special behavioral needs that could only become more challenging as they aged. By all accounts the children were improving in foster care.

{¶21} Mother eventually progressed to unsupervised visitation for ten hours per week. However, Mother expressed to an MCDJFS caseworker that she had difficulty when dealing with all three children for the extended period of time. Further, reports were consistent that the children regressed in their behaviors after visiting with the parents. There were also some notable negative incidents during visitations. In fact, Mother had to "step out" of some supervised visits because she was "overwhelmed" and "stressed" out. A licensed professional counselor testified that as of her last interactions with the parents, neither parent was properly equipped to handle the children's special needs given their own mental health struggles.

**{¶22}** The testimony established that the parents did not have a support system of family or friends. Mother testified that she had a learning disability but had been improving through counseling and the assistance provided by MCDJFS.

**{¶23}** Father testified regarding the new residence the parents were living in with the family-friend who was a disabled veteran. He testified he was working two jobs totaling approximately 70 hours per week.

**{¶24}** Father testified that he made between $10 per hour and $11 per hour at both jobs, and that he did not have health insurance. Father also did not have a license and he owed over $3,800 in reinstatement fees. Mother made between $10 and $11 per hour at her job, which she had worked sometimes part time and sometimes full time. MCDJFS specifically tried to get Mother a more stable, higher-paying job by engaging a service called "VentureLINX." Although MCDJFS spent over $2,000 on this service, Mother did not follow-through to utilize the service. Despite the parents' repeated financial struggles and their heavy reliance on outside assistance, the parents testified they were confident they could pay their bills and care for the children.

## Analysis

**{¶25}** After the trial court determined that the children had been in the temporary custody of MCDJFS for twelve or more months of a consecutive twenty-two month period, the trial court was required to determine whether it was in the

children's best interests for permanent custody to be granted to MCDJFS pursuant to the factors in R.C. 2151.414(D)(1). We will address the evidence related to each of those factors in turn.

{¶26} With regard to factor (a), there was undoubtedly some bond between the parents and the children. However, the substantial regression in the children after visiting with the parents was a common theme during the testimony of MCDJFS caseworkers. By contrast, the children were doing well in their foster home during the case, but they were transferred to a foster-to-adopt home at one point and they were progressing there.

{¶27} With regard to factor (b), the GAL recommended that MCDJFS be granted permanent custody of the children.

{¶28} With regard to factors (c) and (d), the children had been in the temporary custody of MCDJFS for approximately two years. They were strongly in need of legally secure placement. Testimony indicated that the parents still struggled to support themselves and their housing was still in question at the time of the final hearing. Testimony indicated that the parents struggled with their own mental health issues and they were not equipped to deal with the special needs of the children.

{¶29} With regard to factor (e), and the analysis of R.C. 2151.414(E)(7) through (11), none of the factors appear relevant.

{¶30} After reviewing all the factors, the trial court determined that there was clear and convincing evidence that it was in the children's best interests that

MCDJFS's permanent custody motion be granted. Following our own review of the record and the trial court's decision, we agree with the trial court, and the GAL's summary, that the parents "have not been able to become independent, self-sufficient and stabilized." Although the parents at times made progress, the children are in dire need of permanency. Therefore, after reviewing all of the evidence, we find that the trial court's determination is supported by clear and convincing evidence. Accordingly, Father's first assignment of error and Mother's second assignment of error are overruled.

*Mother's First Assignment of Error*

**{¶31}** In her first assignment of error, Mother argues that the trial court erred by failing to make the findings required under R.C. 2151.4117.

Relevant Authority

**{¶32}** Revised Code 2151.4115 through 2151.4122 (the "Kinship Caregiver Act") became effective on September 30, 2021. The Act requires a public children services agency, such as MCDJFS, to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in [the] [t]emporary custody of the agency." R.C. 2151.4116(A). A "kinship caregiver" includes individuals related to the child by blood or adoption, such as grandparents or siblings, as well as stepparents and stepsiblings, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and long-standing relationship or

-13-

bond with the child or the family, which relationship or bond will ensure the child's social ties." R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85 for application to R.C. 2151.4116 through 2151.4122).

{¶33} Once a child is in an agency's temporary custody, the juvenile court must determine at every hearing regarding the child whether the agency has satisfied its duty to use intensive efforts to identify and engage an appropriate and willing kinship caregiver. R.C. 2151.4117. However, the juvenile court may issue an order relieving the agency of its obligation to exercise intensive efforts if it determines that continuation of the child's current placement is in the child's best interest and that continued intensive efforts are unnecessary based on the findings in R.C. 2151.4119.[5]

{¶34} Notably, the parents did not raise any lack of compliance with the Kinship Caregiver Act to the juvenile court. Therefore, the parents have forfeited all but plain error. *In re A.M.*, 2024-Ohio-1164, ¶ 47 (8th Dist.). Plain error is very limited in civil cases and it is "extremely rare" and found only in exceptional circumstances where the error "'rises to the level of challenging the legitimacy of the underlying judicial process itself.'" *In re A.D.*, 2022-Ohio-736, ¶ 17 (12th Dist.),

---

[5] Although not implicated in this case, for reference, to issue an order relieving the agency of its statutory obligation under R.C. 2151.4116, the juvenile court must find: (1) "[t]he child has been living in a stable home environment with the child's current caregivers for the past twelve consecutive months," (2) "[t]he current caregivers have expressed interest in providing permanency for the child," and (3) "[t]he removal of the child from the current caregivers would be detrimental to the child's emotional well-being." R.C. 2151.4119(A) through (C). If the juvenile court makes the findings under R.C. 2151.4119, then the juvenile court and the public children services agency "may consider the child's current caregiver as having a kin relationship with the child and at an equal standing to other kin in regards to permanency." R.C. 2151.4120.

quoting *In re J.W.*, 2018-Ohio-1781, ¶ 13 (12th Dist.). The plain error doctrine implicates errors that are obvious and prejudicial, having a material adverse impact on the character and public confidence in judicial proceedings. (*Id.*).

Analysis

**{¶35}** In our plain error review of this matter, the trial court determined in its entry following the emergency removal hearing that "[n]o known relatives are available to take care for [sic] the child." Following that entry, the trial court did not explicitly discuss the Kinship Caregiver Act or cite the act, but it was not raised by the parties.

**{¶36}** Mother seeks this Court to find plain error for the trial court failing to make a finding related to the Kinship Caregiver Act when she has not identified a placement that was even *potentially* possible. The case plans docketed in the record indicate that "No relatives were willing and able to be approved for placement of the children." This is consistent with the evidence presented at the final hearing that the parents had almost no support system from friends and family.

**{¶37}** Given our standard of review, even if we accepted that it was error for the trial court to fail to make the statutorily required findings, we could find no plain

error because there is no demonstrable prejudice.[6] Therefore, Mother's first assignment of error is overruled.

*Father's Second Assignment of Error*

**{¶38}** In Father's second assignment of error he argues that the trial court erred by failing to consider less restrictive alternatives before terminating parental rights.

Analysis

**{¶39}** In his brief, Father summarily argues that *Mother* was granted unsupervised visitation and was making efforts to stabilize her living conditions. He argues that permanent custody should only be granted when there are no viable alternatives.

**{¶40}** Contrary to his argument, we have stated previously that R.C. 2151.414 "reveals no requirement that the trial court favor alternate placement over awarding permanent custody." *In re J.R.*, 2009-Ohio-4113, ¶ 21 (3d Dist.). Here, the trial court followed the statutory procedures and determined that the children had been in the temporary custody of MCDJFS for twelve or more months of a consecutive twenty-two month period, and that it was in the children's best interests

---

[6] We would note that the Tenth District Court of Appeals has determined that "Once a child enters the permanent custody of a public children services agency, the question of whether the child should reside in foster care or with a kinship caregiver while the child is in the agency's temporary custody becomes moot." *In re L.R.-L*, 2023-Ohio-2071, ¶ 20 (10th Dist.).

that MCDJFS be granted permanent custody. Both of these findings are supported by clear and convincing evidence.

{¶41} At the time of the final hearing on MCDJFS's permanent custody motion, there were no alternative motions pending. We do not find that the trial court erred in ruling on the motions directly before it, particularly when the trial court's judgment was supported by clear and convincing evidence. Therefore, Father's second assignment of error is overruled.

*Conclusion*

{¶42} Having found no error prejudicial to Mother or Father in the particulars assigned and argued, the assignments of error are overruled and the judgments of the Mercer County Common Pleas Court, Juvenile Division, are affirmed.

***Judgments Affirmed***

**ZIMMERMAN and WILLAMOWSKI, J.J., concur.**

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

_____
Juergen A. Waldick, Judge


_____
William R. Zimmerman, Judge


_____
John R. Willamowski, Judge

DATED:
/jlm