[Cite as *In re B.S.*, 2025-Ohio-4518.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SHELBY COUNTY


IN RE:                                          CASE NO. 17-24-16

     B.S.,

ADJUDGED DEPENDENT                              OPINION AND
CHILD.                                          JUDGMENT ENTRY

[MICHAEL S. - APPELLANT]
[ANNA S. - APPELLANT]



IN RE:
                                                CASE NO. 17-24-18
     H.S.,

ADJUDGED DEPENDENT
CHILD.                                          OPINION AND
                                                JUDGMENT ENTRY
[MICHAEL S. - APPELLANT]
[ANNA S. - APPELLANT]

IN RE:                                     **CASE NO. 17-24-19**

    **W.S.,**

**ADJUDGED DEPENDENT**              **OPINION AND**
**CHILD.**                                 **JUDGMENT ENTRY**

**[MICHAEL S. - APPELLANT]**
**[ANNA S. - APPELLANT]**

**Appeals from Shelby County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 2022 NEG 0024, 2022 NEG 0026 and 2022 NEG 0027**

**Judgments Affirmed**

**Date of Decision: September 29, 2025**

**APPEARANCES:**

    *Robert E. Long, III* **for Appellant, Anna Smith**

    *Linda Gabriele* **for Appellant, Michael Smith**

    *Madison S. Brinkman* **for Appellee**

**MILLER, J.**

{¶1} Michael S. and Anna S. (collectively, "the parents") appeal the December 2, 2024 judgments of the Shelby County Court of Common Pleas, Juvenile Division, placing B.S., H.S., and W.S. in the legal custody of the Shelby County Department of Job and Family Services, Juvenile Division ("the Agency"). For the reasons that follow, we affirm.

*Facts and Procedural History*

{¶2} Michael S. and Anna S. are the biological parents of B.S. (born 2011), C.S. (born 2011), H.S. (born 2013), and W.S. (born 2015). On May 19, 2022, the Agency filed a complaint alleging that B.S., C.S., H.S., and W.S. were neglected and dependent children pursuant to R.C. 2151.03(A)(2) and (3) and R.C. 2151.04(A), respectively, and requesting the trial court place the children in its protective supervision.

{¶3} Specifically, the supporting affidavit alleged that the home that Michael and Anna were living in was "overwhelmed with filth." The concerns in the home included trash and clutter littered throughout the home, cockroach and bedbug infestations, and a large number of animals, including cats, dogs, and a live raccoon. Furthermore, the affidavit noted concerns relating to continual absences and lack of progress in the children's online-school curriculum which was negatively impacting their education.

{¶4} At the adjudication hearing on July 7, 2022, the parents consented to a finding that the children were dependent as alleged in the complaint. In exchange, the Agency agreed to dismiss the allegations of neglect alleged in the complaint. The court found that it was in the children's best interest to remain in the care and custody of the parents with the Agency providing protective supervision.

{¶5} However, on August 30, 2022, the Agency filed an ex parte motion for emergency custody of the children. In the supporting affidavit, the caseworker averred that despite the supervision of the Agency, including arranging for the family to stay in a hotel while the parents attempted to address the concerns in the home, the conditions of the home actually further deteriorated. The conditions of the home included trash in every room, including dirty diapers that were not properly disposed of, inadequate beds, filthy floors, bedbug and cockroach infestations, ceilings and floors needing structural attention, and floors saturated with urine, feces, and filth. Additionally, three dogs, two foxes, and a raccoon were living in the home in "filthy" cages. Moreover, the children's behaviors were reported to be "out-of-control." At the shelter-care hearing held the following day, the trial court removed the children from the parent's custody and placed the children in the care of the Agency. In the meantime, the parents worked with the Agency on the case plan objectives, including obtaining and maintaining a safe and stable living environment, completing a mental-health assessment, and participating in parenting classes.

{¶6} In March 2023, C.S. was returned to the custody of the parents. In June 2024, the Agency filed a motion to close the case with respect to C.S. The trial court granted the Agency's motion and C.S. was returned to the legal custody of the parents.[1]

{¶7} The parties continued to work on the case plan objectives and, on January 4, 2024, H.S. was returned to Michael and Anna's residence. However, on April 11, 2024, H.S. was returned to the custody of the Agency due to concerns with the condition of Michael and Anna's home and several confrontations between H.S. and her parents—culminating in H.S. physically assaulting Anna.

{¶8} On June 7, 2024, the Agency filed a motion for permanent custody of B.S., H.S., and W.S. A permanent custody hearing was held on October 3rd and 4th, 2024. On October 21, 2024, Michael, Anna, and the Agency filed their proposed findings of fact and conclusions of law. On December 2, 2024, the trial court filed its judgment entries granting permanent custody of B.S., H.S., and W.S. to the Agency.

{¶9} On December 13, 2024, Michael filed his notices of appeal. He raises three assignments of error for our review. Anna filed her notices of appeal on December 26, 2024. She raises five assignments of error for our review. Due to the considerable overlap between Michael's assignments of error and Anna's

---

[1] Accordingly, on appeal, the parents do not challenge the trial court's decision with respect to C.S.

assignments of error, we elect to address the assignments of error in an order that facilitates our resolution of the cases.

### Michael's First Assignment of Error

**The trial court's decision is against the manifest weight of the evidence as the Agency did not prove by clear and convincing evidence that the Agency should be granted permanent custody of the minor children.**

### Michael's Second Assignment of Error

**The trial court abused its discretion in finding that permanent custody to the Agency was in the minor children's best interest.**

### Anna's Fifth Assignment of Error

**The trial court's decision granting Appellee Permanent Custody of B.S, W.S. and H.S. is against the sufficiency-of-the-evidence and against the manifest-weight-of-the-evidence.**

{¶10} In Michael's first and second assignments of error and Anna's fifth assignment of error, the parents argue that the trial court erred by finding that the Agency proved by clear and convincing evidence that the Agency should be granted permanent custody of B.S., H.S., and W.S., and that the trial court's decision to grant permanent custody to the Agency was in the children's best interest.

*Manifest-Weight Review of Permanent-Custody Decisions*

{¶11} "When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly

lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *In re Dn.R.*, 2020-Ohio-6794, ¶ 16 (3d Dist.), quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001).

{¶12} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings . . . were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is the "'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" *In re Dn.R.* at ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, ¶ 55 (4th Dist.).

{¶13} "Reviewing courts should afford deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 2016-Ohio-7057, ¶ 20 (5th Dist.). "A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'"" *In re Dn.R.* at ¶ 19, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

*Standard & Procedures for the Termination of Parental Rights*

{¶14} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 2003-Ohio-5885, ¶ 7 (3d Dist.). These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 2003-Ohio-1269, ¶ 6 (3d Dist.).

{¶15} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 2018-Ohio-

125, ¶ 12 (3d Dist.), citing *In re B.C.*, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 2015-Ohio-2740, ¶ 13 (3d Dist.). "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 2017-Ohio-4218, ¶ 10 (3d Dist.).

As relevant to this case, R.C. 2151.414(B)(1) provides:

[T]he court may grant permanent custody of a child to a movant if the court determines at a hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

. . .

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period[.]

R.C. 2151.414(B)(1)(d).

{¶16} "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test, which requires the trial court to 'determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest.'" *In re K.M.S.*, 2017-Ohio-142, ¶ 23 (3d Dist.), quoting *In re A.F.*, 2012-Ohio-1137,

-9-

¶ 55 (3d Dist.) and citing R.C. 2151.414(B)(1). "The best interest determination is based on an analysis of R.C. 2151.414(D)." *Id.*

{¶17} "Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors." *Id.* at ¶ 24, citing *In re H.M.*, 2014-Ohio-755, ¶ 27 (3d Dist.). The factors specifically listed in R.C. 2151.414(D)(1) are:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period. . . ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). "Under this test, the trial court considers the totality of the circumstances when making its best interest determinations. No single factor is given more weight than others." *In re N.R.S.*, 2018-Ohio-125, at ¶ 16.

*Analysis*

{¶18} Michael and Anna do not dispute that B.S., H.S., and W.S. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody. Therefore, the parents do not challenge the trial court's determination that R.C. 2151.414(B)(1)(d) applies to B.S., H.S., and W.S. Rather, in these assignments of error, the parents argue that the trial court erred by determining that granting the Agency permanent custody is in the children's best interest. However, after examining the trial court's best-interest findings and reviewing the record, we conclude that clear and convincing evidence supports the trial court's best-interest determination.

*R.C. 2151.414(D)(1)(a)*

{¶19} With respect to R.C. 2151.414(D)(1)(a), the trial court found, in relevant part:

> The Court does find the Mother's testimony regarding H.S.'s animosity towards her parents to be credible. This issue remains fully unresolved because of a lack of effort of the parents under the case plan to take counseling and similar solutions seriously. Mother even now proposes that H.S. should just remain outside the home indefinitely, until H.S. resolves her issues—as if it were the job of the child to fix the problem. Mother even assures the Court that she would now be willing to be involved in meaningful counseling with the child. The Court does not find this assertion credible given the fact that it still hasn't happened for any credible or sustained period over the long history of this case. After years out of the home, that type of proposal does not provide H.S. the stability and finality she sorely needs—a concern that Mother does not appear to have.

. . .

> There is no dispute that the children have thrived and greatly benefitted from the foster care in which they have been involved. The relationships with the foster caregivers has been healthy and extremely beneficial to the health, safety, and welfare of each of the children. Overall, the Court finds the testimony of the foster care providers credible and well-taken regarding the care provided and their healthy relationships with the children in their care.
>
> Foster parent Regina Whiteknack also testified that she would be interested in adopting H.S.

(Dec. 2, 2024 Judgment Entries).

{¶20} At the permanent-custody hearing, the foster parents, both current and former, reported having positive, secure relationships with B.S., H.S., and W.S. The foster parents also described the relationships between B.S., H.S., and W.S. as generally positive and the foster parents testified that they work together to plan visitations for the sisters to spend time together.

{¶21} Makayla Zweibel ("Zweibel"), the visitation coach, described the visitations that she supervised with the family as "chaotic." She testified that B.S. and H.S. would attempt to "parent" the other children. Zweibel described an incident in which W.S. hung upside down on a railing over cement steps, posing grave danger if she would have fallen. However, it was H.S., and not the parents, who removed W.S. from the railing and warned her that she could have gotten hurt.

{¶22} A recurring concern with the visitation coach, parenting coach, and caseworkers was Michael's lack of interaction with the children during visitation.

According to the witnesses, Michael would often sit by himself and not interact with the children when the rest of the family was engaging in an activity together. They reported that when Michael's lack of involvement was pointed out to him, he would sometimes attempt to engage with the children, but there were also occasions where Michael still refused to participate. For instance, when B.S. expressed her feeling to Zweibel that she felt that Michael did not want to spend time with her and her siblings, Michael told Zweibel he is a "rude person" and "wasn't going to do it."

{¶23} As a result of Michael's lack of interaction with the children, Anna was reportedly pulled in multiple directions. For example, in the family visitations, the children often became unruly and, at times, began fighting amongst themselves. Zweibel reported that the parents often did not discipline the children, but if they did, it was done by Anna. The visitation coach, Nicole Oren, testified that Anna would sometimes shut down the children if they attempted to talk to her.

{¶24} Although H.S. was returned to Anna and Michael's residence in January 2024, she was ultimately returned to the custody of the Agency. During a home visit while H.S. was residing with her parents, Michael told the caseworkers "[you] need to take her, she needs to go, she's going with you guys." H.S. was subsequently removed from the home after she physically assaulted Anna. The police were called twice to the home, and H.S. was charged in juvenile court with being an unruly child as a result of the incident. Anna admitted that she and H.S. have a troubled relationship and that they would "need a lot of extensive family

therapy before choosing to have [H.S.] back in the home for now." Anna described her relationship with B.S. and W.S. as positive and described a playful, loving, affectionate relationship with them.

{¶25} Based on the foregoing, it is clear that B.S., H.S., and W.S. have positive relationships with their foster parents and with each other. It is evident that Anna loves her children, but struggles to discipline them. Additionally, Michael's relationship with B.S., H.S., and W.S. is strained by his lack of interaction with the children at visitations. Thus, the record supports the trial court's findings under R.C. 2151.414(D)(1)(a).

*R.C. 2151.414(D)(1)(b)*

{¶26} With respect to the R.C. 2151.414(D)(1)(b), the trial court found that the report of the GAL was consistent with the evidence presented at the hearing. In its judgment entries the trial court recounted that it conducted an in-camera interview with each of the three girls after the conclusion of the permanent-custody hearing. The court noted that the girls "presented as young and immature for their ages" which was consistent with the evidence presented at trial and the children's respective developmental levels.

{¶27} Further, the trial court noted that B.S. and W.S. expressed a desire to "go home." However, that desire was not shared by H.S. According to the trial court, B.S. and W.S. "were unable to verbalize concerns about life at home with their parents" and were apparently not aware of the concerns regarding their

hygiene, education, and the condition of the home. The trial court found "little or no evidence of a bond" between H.S. and her parents. However, the court noted that her "wishes appeared an immature reaction to her circumstances because life in foster care has been more stable and more beneficial." However, the trial court found that it was "glaringly obvious that what each child desired most was for finality in this matter."

{¶28} The court stated that it had "given great thought to the interviews and the maturity and practicality of each child's wishes and concerns" and that the decision "takes into account those wishes and concerns and weighs them in light of the evidence presented and concerns for their health, safety, and welfare."

{¶29} At the hearing, it was well-established that each of the three children has some level of cognitive impairment. In addition, B.S., who had the most severe cognitive impairment, also had substantial medical needs that required constant and consistent attention.

{¶30} Evidence was presented that the children were living in filthy conditions before they were removed by the Agency and had medical, educational, and developmental needs that were not being met by the parents. After removal, the children were doing well in the foster home, had improved substantially academically and socially, and had their medical and special needs addressed. Although B.S. and W.S. expressed a desire to return to their parents' home, the record indicates that a return to the parents' house would have been detrimental to

their well-being. Notably, when H.S. was temporarily returned to the parents' home, her behavior declined rapidly and she began exhibiting aggressive behaviors, culminating in H.S. being charged in juvenile court with being an unruly child. The parents were also not consistent with administering H.S.'s medication and when caseworkers visited the parents' house, Michael and Anna were unable to locate the medication. Furthermore, the counselor testified that while in the parents' custody, H.S. routinely came to school dirty, in ill-fitting clothes, and in clothes that were not appropriate for the weather. She also had difficulty staying awake in class and even slept through a math test.

{¶31} When B.S., H.S., and W.S. entered the Agency's custody, they were significantly behind academically. Prior to being removed from the parents' home, they were enrolled in an online school program that, by Anna's admission, was not going well. The children did not regularly attend classes and were discharged unsuccessfully from the program. When H.S. and W.S. entered foster care, they were unable to read and W.S. was unable to count or recognize shapes and colors and was not fully toilet trained. In their foster care placements, the girls made significant progress academically in a short time. We note that "[t]he trial court was not required to place emphasis on the children's wishes or the relationships among the family, to the exclusion of all other factors." *In re J.W.*, 2014-Ohio-2814, ¶ 35 (2d Dist.).

{¶32} Accordingly, we find that the trial court's findings were supported by the record.

*R.C. 2151.414(D)(1)(c)*

{¶33} As to R.C. 2151.414(D)(1)(c), the trial court found that B.S., H.S., and W.S. were removed from the parents' home on August 30, 2022. B.S. and W.S. remained in the Agency's custody since that time. However, H.S. was returned to the temporary custody of the parents from January 4, 2024 but was soon returned into Agency custody on April 11, 2024. The record supports the trial court's findings under R.C. 2151.414(D)(1)(c).

*R.C. 2151.414(D)(1)(d)*

{¶34} With respect to R.C. 2151.414(D)(1)(d), the trial court found as follows:

> The initial complaints in these matters were filed May 19, 2022. Dispositions on the complaints were filed on July 11, 2022. On August 30, 2022, after having plenty of time for the parents to begin to credibly address the concerns set forth in the complaints, and as directed by the case plans, the children were placed in Agency custody due to the parents' failures to do so.
>
> On June 7, 2024, the Agency then filed their respective motions for permanent custody because real progress had still not been made. Since that time the parents have again made no substantial efforts to address the concerns or to substantially complete any portion of the case plans.
>
> Additionally, reference was made throughout the trial regarding the Father's recent stroke and his current inabilities regarding earnings and parenting, raising further concerns. Mother, at trial, even protested to Father testifying on his behalf. There is no evidence

regarding the long-term prognosis or likely outcome of that problem and none was provided by the parents to help satisfy this concern. Moreover, the parents do not have driver's licenses, and the only assertion that the driver's license issue will be resolved is Mother's claim that Father will get a driver's license in the future. The Court finds such a claim suspect given the inability to even demonstrate that Father will be able to do so.

The point of the case plan is for the parents to demonstrate to the Court and the Agency that the concerns that existed have been satisfactorily resolved and that they are, in fact, able to properly handle the health, safety and welfare of the three children. Importantly, it is essential to establish that those efforts have solved problems in a manner that evidences predictability and long-term stability. That has simply not been done.

Essentially the parents have waited to the 'last hour' to assert that they have done something, expecting the Agency to accept any alleged improvement as sustainable without ever having proven that ability.

The parents never presented evidence to the agency of such improvements during the course of the case plan. For instance, the Mother offered pictures of their current leasehold asserting that it is now in good condition—a condition that was never witnessed by the Agency, despite the Agency's regular reviews of their home conditions and their attempts at inspection. The pictures are undated and the condition of the property therein is completely contrary to the credible complaints and evidence offered by the Agency. The parents have long been aware that the Agency [has] serious concerns regarding their inability to maintain a home for multiple children. Not once did the parents credibly reach out to satisfy the Agency of their ability to do so—until trial. The Court finds the photos are not a credible representation of the ongoing problems described.

It is, however, undisputed by the Agency that the parents were able to maintain a very basic living environment for the one child, C.S.—to which they were previously granted legal custody. The issue, however, remains their ability to handle more than one child in the home given all of the children's various educational, medical, housing and other needs and conditions. There is also credible testimony that the Agency is receiving reports of problems with C.S. that are being

watched by the Agency—raising further concerns of whether that arrangement is stable for C.S.

. . .

Further, at trial, the defense raised the issue proposing that the parents would be financially able to afford all of the children in the home without the necessity of either parent's employment (which they both refuse to undertake)—essentially asserting that disability or governmental benefits received for a child would alleviate all of the family's financial concerns. This defense simply misses the point. Money has never been alleged as the principal reason for the parents' failure that resulted in the removal of the children from their home in the first place. Even if true the parents present no credible evidence that it will resolve their failures throughout this case. The parents, after opportunity to do so, have not even demonstrated any ability for budgeting or financial management, eschewing all services or counseling by the State might evidence the same. More money does not mean a better life for the children if there is no ability to properly manage the same. Moreover, any monies would be for the benefit of the child, not the parents who still need funds to support themselves.

Overall, the issues raised by the parents are assertions that, suddenly, at the time of the permanent custody hearing, purport to prove that they have resolved, or can resolve, all the problems noted throughout this case—without ever having made the effort to credibly substantiate the same to the Agency during the years this case has been pending. Even if temporary progress has been made, the history of the parents is that it will not continue. Having had years to prove they could sustain needed improvements they simply have not done so. Their request to the Court is to give them a chance for some indefinite time. The Court does not find the same well taken.
. . .

Despite the reasonable case planning and diligent efforts by the [Agency] to assist the parents to remedy the problems that initially caused the child/children to be placed outside the home, each parent has failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home. B.S., H.S., and W.S. cannot be placed with Michael or Anna within a reasonable time and should not be placed with either of them.

> Pursuant to R.C. 2151.414(B)(1)(a) and 2151.414(E)(1) the Court finds, by clear and convincing evidence, that the children cannot be placed with either of the children's parents within a reasonable time and should not be placed with either [of the] children's parents. The Court further finds, by clear and convincing evidence, that the [Agency] has also met its burden under R.C. 2151.414(E)(1).

(Dec. 2, 2024 Judgment Entries).

{¶35} At the hearing on the Agency's motion for permanent custody, the parties testified as to the case plan services and Michael and Anna's progress thereon.

{¶36} The first case plan objective was for Michael and Anna to provide for the basic needs of B.S., H.S. and W.S. The caseworker, Janice Geise ("Geise"), opined that Anna and Michael were not compliant with his case plan objective.

{¶37} Geise testified that, initially, Anna was complying with meeting the children's basic needs. However, according to Geise, that changed. Geise described the parents' home as "not kept" with pull ups with feces in them on the floor. According to Geise, the parents did not provide hygiene products, such as toothpaste, when the girls visited the home overnight, so it became the foster parents' responsibility to supply those products. Furthermore, H.S.'s guidance counselor testified that when H.S. was temporarily back in the custody of the parents, she struggled with maintaining hygiene and would come to school dirty. The counselor sent H.S. home from school with basic hygiene items, such as

shampoo and body wash, after learning that H.S. did not have access to those products at Michael and Anna's house.

**{¶38}** Furthermore, the children left overnight visitations in dirty or soiled clothing that was not always appropriate for the weather or the size of the child. The foster parents also reported that when they sent appropriate clothing with the children to the overnight visitations, the clothing was frequently not returned.

**{¶39}** B.S.'s medical condition necessitates the need for pull ups, Poise pads, and nightly enemas. B.S.'s foster parents would send B.S. to the weekend visitations with enough supplies to manage her medical needs; however, B.S. would frequently return from visitations with many of the supplies unused, indicating to the foster parents that B.S. was not changing her hygiene products frequently. This was a source of concern because B.S.'s medical condition requires frequent changing of her medical supplies and; indeed, when B.S. entered foster care, she had a severe skin infection on her genitals due to her medical supplies not being changed as frequently as was necessary while in Michael and Anna's care.

**{¶40}** The next case plan objective was for the parents to remedy the concerns regarding their housing and living environment. To fulfill this objective, Geise stated that they were required to obtain and maintain safe and stable housing. Geise opined that Michael and Anna have not been compliant with fulfilling this case plan objective.

**{¶41}** After the children were taken into the Agency's temporary custody, Michael and Anna moved to the local emergency shelter where they were nearly forced to vacate due to Michael's disruptive behavior and the parents' lack of cleanliness. From there, the parents moved to a one-bedroom apartment. Eventually, the parents obtained a four-bedroom apartment in a federally-subsidized housing complex. Geise described the four-bedroom home as generally "dirty" and described pizza boxes and ashtrays on beds and clothes piled high with feces and urine, soiled pull-ups on the floor, and an unpleasant odor throughout the house. The caseworkers testified that they addressed the concerns relating to the condition of the house with the parents on numerous occasions and they have not been receptive to the redirection and generally offered excuses as to the house's condition. According to Geise, although her visits to the parents' home were typically announced, Geise described instances where she was denied access to the home or was not permitted to access certain parts of the home.

**{¶42}** The parents attempted to assuage the concerns regarding the condition of the home by introducing a series of photographs, which Anna testified were taken over a span of several months, which depicted the home in a clean condition. However, the caseworkers and the GAL expressed that they had never observed the home in such a clean condition, with the GAL describing "shock" at seeing the photographs because in her monthly visits to the residence, she never saw the house in such a clean state.

{¶43} The next case plan objective was for the parents to obtain a source of income. According to Geise, Michael, who was disabled and received his income through disability benefits, was not required to obtain additional income to comply with the case plan objective. Accordingly, Michael was in compliance with that case plan objective.

{¶44} However, Geise stated that Anna, who was required as part of the case plan to obtain a job, even part-time, was unemployed throughout the pendency of the case. Geise testified that she continually addressed Anna's need for employment with her, and Anna consistently said that she had anxiety that was too severe for her to obtain employment. For her part, Anna stated, "I am a stay-at-home mom. I love caring for [C.S.], but I also care for [Michael], who is much like a child sometimes." Anna explained that caring for C.S. and Michael is an impediment to working at a job outside of the home. Specifically she stated, "[Michael], he forgets who he is a lot. He's had several strokes. He also . . . could start a fire in the house. He doesn't always know where he's at."

{¶45} The next case plan objective was mental-health services. To fulfill the case plan objective, the parents were each required to complete a mental-health assessment and to follow the professional recommendations resulting from the assessment. Additionally, the parties were required to obtain mental-health services for the children when they are in the parents' custody.

{¶46} Geise testified that the parents have been non-compliant with the mental health case plan objective. Although they both completed the mental-health assessment, both parents were non-compliant with the recommended counseling.

{¶47} Additionally, during the months that H.S. was in their care, the parents did not adequately obtain counseling and mental-health services for her. In more than three months that H.S. was in her parents' temporary custody, she only attended two mental-health counseling appointments. Furthermore, as previously detailed, H.S. did not consistently receive her medication while in the parents' care.

{¶48} The next case plan objective was for the parents to satisfactorily complete coaching services and parenting education. However, according to Geise, the parents were non-compliant with this case plan objective. Specifically, the parents were deemed to need coaching services to address parenting, budgeting, home cleanliness, and life skills, and they failed to meet the objectives. The parents would frequently cancel the coaching appointments. In her testimony, Anna explained that she did not find the services useful or helpful and did not believe that she benefitted from taking them.

{¶49} Relatedly, one of the parents' case objectives was to follow professional recommendations. Geise testified that based on the lack of follow through with the services, including the budgeting and parenting coaches, that the parents were also non-compliant with that case plan objective.

{¶50} Another case plan objective was for the parents to attend all of the monthly team meetings at the Agency. Geise testified that although, initially, the parents attended the meetings, they eventually stopped attending despite the Agency scheduling the team meetings for times that the parents expressed were the most convenient for them and with the option of attending virtually or by telephone. Geise recalled that if the parents were not at the meeting, she would attempt to call the parents, but they would not answer the phone.

{¶51} The parents also had a case plan objective which required them to tend to the educational needs of the children when they were in their care, including making sure homework was done, the children were well-rested, and attended school on a consistent basis. However, Geise testified that this case plan objective was not met. As previously detailed, when H.S. was in the custody of Michael and Anna, the counselor noticed her struggling in school. Specifically, she would come to school dirty and in clothing that was ill fitting and not seasonally appropriate. H.S. also missed ten days of school in the few months that she was in Michael and Anna's temporary custody. Additionally, she reportedly came to school tired, even sleeping through an entire math exam. According to H.S.'s guidance counselor, within a single day of H.S. being removed from her parents' custody and being placed in the care of her foster parents, she was a "changed girl." In her foster parents' home, H.S. came to school in clean clothes, was happy, and had regular

attendance, and the guidance counselor even observed her happily skipping down the school halls.

**{¶52}** According to Geise, Michael and Anna were compliant with several case plan objectives. Namely, they signed all releases of information that the Agency requested and they consistently had medical coverage for the family through Medicaid, and Anna informed the agency of any life-altering events (e.g., moving).

**{¶53}** Geise testified that, overall, the parents were non-compliant with the case plan.

**{¶54}** Throughout the hearing, representatives of the Agency were repeatedly asked to explain the apparent dichotomy between the Agency filing for permanent custody of B.S., H.S., and W.S. while also filing for the parents to receive custody of C.S. The Agency representatives consistently stated that the parents demonstrated that they were able to meet the bare, minimum needs of a single child (C.S.) in their home. However, as evidenced by H.S. returning to her parents' home and then needing to be removed again, the Agency observed that the addition of another child to the home overwhelmed the parents and that the living conditions in the home and the care that the parents were able to provide for the children in the home deteriorated rapidly. Furthermore, H.S. was moved first to the home because she was deemed by the Agency, with the parents' input, to be the most stable of the children without substantial medical or educational needs. However, in the parents'

care, H.S.'s stability very quickly deteriorated culminating in several violent outbursts necessitating police involvement and resulting in an unruly child charge filed in the juvenile court. Additionally, although C.S. remains in the parents' custody, the Agency expressed concerns regarding the parents' ability to care for his basic needs. For instance, C.S. consistently arrived at visitations smelling strongly of feces.

{¶55} Ultimately, by failing to address the conditions that resulted in B.S., H.S., and W.S.'s removal from their custody, the parents have not demonstrated that they are capable of providing for B.S., H.S., and W.S.'s needs in a stable environment. Therefore, the record supports the trial court's findings under R.C. 2151.414(D)(1)(d).

*R.C. 2151.414(D)(1)(e)*

{¶56} Concerning R.C. 2151.414(D)(1)(e), the trial court found that the factors outlined in R.C. 2151.414(E)(11) do not apply to the parents. The record supports the trial court's findings under R.C. 2151.414(D)(1)(e) and the parents do not specifically challenge the trial court's findings in this regard.

{¶57} In sum, competent and credible evidence supports each of the trial court's best-interest findings. Considering the length of time the children have been in the Agency's custody, Michael and Anna's failure to remedy the conditions that caused B.S., H.S., and W.S.'s removal, and all of the other factors reviewed above, clear and convincing evidence supports the trial court's determination granting

permanent custody of B.S., H.S., and W.S. to the Agency is not against the manifest weight of the evidence.

{¶58} Michael's first and second assignments of error and Anna's fifth assignment of error are overruled.

**Michael's Third Assignment of Error**

**The trial court committed prejudicial error in finding that the Agency made reasonable efforts for the minor children to return to the custody of their parents.**

{¶59} In his third assignment of error, Michael alleges that the trial court erred by finding that the Agency made reasonable efforts to return B.S., H.S., and W.S. to the custody of the parents. Michael argues that he and Anna "worked through a lengthy process to create a stable environment for the children." (Michael's Appellate Brief at 22). He contends that there was ample evidence in the record, specifically, in the judgment entries of the review hearings, that the parents were addressing the concerns with their residence, exercising visitation with the children, and working the case plan services. Michael concedes that the judgment entry of the April 2024 review hearing indicates that the parents had lapsed in their case plan efforts. Specifically, he argues that the Agency "did not provide guidance nor assistance" from June 2024 to the time of the permanent custody hearing in October 2024.

-28-

*Reasonable Efforts*

**{¶60}** "When the state intervenes to protect a child's health or safety, '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are called "reasonable efforts."'" *In re C.F.*, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "'Reasonable efforts mean that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3d Dist.), quoting *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.). However, "'"[r]easonable efforts" does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible.'" *Id.*, quoting *In re M.A.P.*, 2013-Ohio-655, ¶ 47 (12th Dist.). "[T]he meaning of 'reasonable efforts' 'will obviously vary with the circumstances of each individual case.'" *In re C.B.C.*, 2016-Ohio-916, ¶ 76 (4th Dist.), quoting *Suter v. Artist M.*, 503 U.S. 347, 360, 112 S.Ct. 1360 (1992).

**{¶61}** "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.* at ¶ 29. Under R.C. 2151.419, when a trial court

removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency . . . has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

R.C. 2151.419(A)(1). This statute applies at "'adjudicatory, emergency, detention, and temporary disposition hearings, and dispositional hearings for abused, neglected or dependent children[.]'" *In re N.R.S.*, 2018-Ohio-125, ¶ 25 (3d Dist.), quoting *In re C.F.* at ¶ 41. However, "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *In re C.F.* at ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.). However, this does not relieve children services agencies of the duty to use reasonable efforts. *Id.* at ¶ 42. "If [an] agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

*Analysis*

{¶62} In his argument relating to his third assignment of error, Michael specifically challenges the trial court's finding that the Agency employed reasonable efforts to reunite B.S., H.S., and W.S. with the parents from April 2024 to October 2024. He alleges that the Agency did not allow parents to graduate to "meaningful visits," did not promote the best interest of the children by ceasing

assistance, denying reunification, and requesting permanent custody. (Michael's Appellate Brief at 23).

**{¶63}** In its judgment entries granting permanent custody of B.S., H.S., and W.S. to the Agency, the trial court stated that "[The Agency] has made reasonable efforts to prevent the removal, to eliminate the continued removal, or make it possible for B.S., H.S., and W.S. to return home safely to the home of either parent." First, we note that the trial court found at the adjudication, disposition, shelter care, and review hearings that the Agency was making reasonable efforts to prevent the continued removal of the children from the home. It was, accordingly, not required to make reasonable-efforts findings pursuant to R.C. 2151.419(A)(1) before granting the Agency's motions for permanent custody. *See In re C.F.* at ¶ 41-43.

**{¶64}** To the extent that Michael challenges the Agency's diligence in continuing in its efforts to reunite B.S., H.S., and W.S. with the parents from April 2024 to October 2024, we do not find that his argument is well taken.

**{¶65}** The testimony adduced at the permanent-custody hearing indicates that the Agency was actively working toward moving the children back into the parents' home. According to Wes Brascum, the supervising case worker, in an effort not to overwhelm the parents and to set them up to be successful with the return of all four of their children, the Agency elected to stagger the return of the children to the home. First, C.S. was returned to the home, and the parents demonstrated at the time that they were able to meet his basic needs. As a result, in

January 2024, the Agency placed H.S., whom the Agency deemed to be the most stable at that point in time, back into the home of the parents.

{¶66} However, the situation quickly deteriorated. The testimony at trial indicates that the condition of the parents' home worsened, with caseworkers observing piles of dirty diapers and soiled clothing in the home. Furthermore, the parents were unable to find H.S.'s medication, resulting in her missing multiple days of medication. H.S. missed ten days of school in this time and was arriving at school in dirty clothes and clothes that did not fit or were not appropriate for the season, and had difficulty staying awake in school. H.S.'s behavior also drastically worsened and she was prone to violent outbursts, culminating in the police being called twice to Michael and Anna's house. H.S. was charged with being an unruly child for an April 6, 2024 incident where she physically assaulted Anna. As a result of the myriad of concerns, the trial court granted the Agency's motion to remove H.S. from the parents' home and place her back into the Agency's custody. In June 2024, the Agency filed for permanent custody of B.S., H.S., and W.S.

{¶67} Michael alleges that the trial court failed to employ reasonable efforts to prevent the continued removal of B.S., H.S., and W.S. from the home from June 2024 to October 2024, while its motion for permanent custody was pending. We disagree.

{¶68} Prior to H.S.'s removal from the home in April 2024, the parents were enjoying extended, unsupervised weekend visitation with B.S., H.S., and W.S. at

their home. However, following the events that led to H.S.'s removal from the home, the Agency moved the visits to supervised visitations at the Agency. The visitation supervisor indicated that the visits were chaotic and that although the parents were diligent about attending the visitations, they often did not follow the guidance to bring an activity for the family to enjoy together.

{¶69} The caseworkers testified that they told the parents that although they had filed a motion for permanent custody that the case was not over and that they were still continuing to work toward reunification of B.S., H.S., and W.S. with the parents. The Agency encouraged the parents to continue to work the case plan and to work reunification services. However, the testimony indicates that once the motion for permanent custody was filed, the parents' efforts to work the case plan stalled. One such example is that the parents no longer attended the primary care meetings.

{¶70} Accordingly, for the foregoing reasons, we find that Michael's argument that the Agency did not employ reasonable efforts is not well taken. Michael's third assignment of error is overruled.

### Anna's Second Assignment of Error

**The trial court erred by not requiring the Appellee to establish that there is no appropriate kinship caregiver, including a relative, to assume the care and custody of the children in lieu of Permanent Custody.**

**Anna's Third Assignment of Error**

**The Trial Court erred by not determining whether Appellee ". . . has continued intensive efforts to identify and engage appropriate and willing kinship caregivers. . . ." (R.C. 2951.4117(A)), and for failing to "[r]eview the efforts of the agency since the previous hearing to place the child with a kinship caregiver. . . ." (R.C. 2151.4117(B)(2).**

**Anna's Fourth Assignment of Error**

**The Trial Court erred in ruling that Appellants waived any objection regarding relative or kinship options.**

{¶71} In Anna's second, third, and fourth assignments of error, she argues that the trial court erred by not requiring the Agency to adequately establish that there is no appropriate kinship provider to care for the children in the lieu of granting permanent custody to the Agency. We disagree.

*Relevant Law*

{¶72} R.C. 2151.4115 through 2151.4122 ("the "Kinship Caregiver Act") became effective on September 30, 2021. The Act requires a public children services agency, such as the Agency, to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in [the] [t]emporary custody of the agency." R.C. 2151.4116(A). A "kinship caregiver" includes individuals related to the child by blood or adoption, such as grandparents or siblings, as well as stepparents and stepsiblings, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and longstanding

-34-

relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties." R.C. 5101.85(F); R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85 for application to R.C. 2151.4116 through 2151.4122).

{¶73} Once a child is in an agency's temporary custody, the juvenile court must determine at every hearing regarding the child whether the agency has satisfied its duty to use intensive efforts to identify and engage an appropriate and willing kinship caregiver. R.C. 2151.4117. However, the juvenile court may issue an order relieving the agency of its obligation to exercise intensive efforts if it determines that continuation of the child's current placement is in the child's best interest and that continued intensive efforts are unnecessary based on the findings in R.C. 2151.4119.

*Analysis*

{¶74} Here, the parents did not raise a concern regarding lack of compliance with the Kinship Caregiver Act until Anna filed her proposed findings of fact and conclusions of law on October 21, 2024, after the hearing on the Agency's motion for permanent custody. In its judgment entries granting the Agency's motion for temporary custody, the court stated as follows:

> The Court further finds that there are no relevant concerns regarding relative, kinship or other placement options that were raised or objected to at trial. Mother's testimony raised no concern or objections regarding this issue. Father, at Mother's in-court insistence, did not testify. In sum, the parents did not raise the issue

of whether the [Agency] complied with R.C. 2151.4116. Accordingly, the Court finds that both the Mother and Father have waived any objection to the same. *See In re J.K.-S.*, 2024-Ohio-2053 and *In re Z.C.*, 2023-Ohio-4703. The Court further finds that post-hearing objections raised in this regard are untimely and not well-taken.

(Dec. 2, 2024 Judgment Entries).

**{¶75}** Nonetheless, Anna argues that because she raised the concern in her proposed findings of fact and conclusions of law, she did not waive the issue. Anna reasons that because her proposed findings of fact and conclusions of law were made in lieu of a closing statement at the hearing, that the concern was timely raised, as it was in essence raised in her closing statement at the permanent-custody hearing.

**{¶76}** We disagree with Anna's argument that she raised timely concerns regarding the Agency and the trial court's compliance with the Kinship Caregiver Act. Anna did not raise the issue until October 21, 2024, several weeks after the permanent-custody hearing. Even if we assume (without deciding) that the objection was raised during a closing argument, we still do not find her objection to be timely. To be timely, an objection must be raised "at a time when such error could have been avoided or corrected by the trial court." *State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus. "An objection raised for the first time in closing argument is untimely." *State ex rel. Holwadel v. Hamilton Cty. Bd. of Elections*, 2015-Ohio-5306, ¶ 50.

**{¶77}** Thus, we find that the parents have forfeited all but plain error. *In re C.Z.*, 2025-Ohio-1699, ¶ 34 (3d Dist.). "'[I]n appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.'" *Brandon v. Brandon*, 2009-Ohio-3818, ¶ 37 (3d Dist.), quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

**{¶78}** Anna asks this court to find plain error for the trial court allegedly failing to make findings relating to the Kinship Caregiver Act; however, she has not identified a placement that was even potentially possible. *See In re C.Z.* at ¶ 36. The case plans docketed in the record indicate that "The agency worked with Anna and Michael [S.] in order to obtain information on possible family members or friend[s] who would be able to take care of the children. Through the contacts provided by Anna and the attempts made by the agency, there were no placement options available." This is consistent with the testimony at the permanent custody hearing that Anna, Michael, and their children were living with Anna's mother when the Agency became involved in the case due to the unsanitary conditions of the home. Further, at the permanent-custody hearing, the case manager testified that she learned that Anna's mother was living with Anna and Michael for a period of time during the case plan. The case worker stated that this caused her concern

because of the insect infestations, including bed bugs, which had been present at Anna's mother's home. No other family members or friends were identified as possible placements for the children.

{¶79} With our plain-error standard of review, even if we accept that it was error for the trial court to fail to make the statutorily required findings, we could not find plain error because there is no demonstrable prejudice. Accordingly, Anna's second, third, and fourth assignments of error are overruled.

**Anna's First Assignment of Error**

**The Trial Court erred by not appointing an attorney for the children to advocate their wishes or interests.**

{¶80} In her first assignment of error, Anna argues that the trial court erred by not appointing an attorney for B.S. and W.S. to advocate for their wishes after they expressed during the in-camera interview that they wished to return home. Anna contends that because B.S. and W.S.'s wishes were in conflict with the recommendations of the GAL, that the trial court should have appointed the girls an attorney to advocate for their wishes.

{¶81} On September 12, 2024, the GAL made a motion for the trial court to conduct an in-camera interview of B.S., H.S., and W.S. The following day, the trial court granted the GAL's motion, and the in-camera interview was held on October 11, 2024.

**{¶82}** In its judgment entries granting the Agency's motion for permanent custody, the trial court stated as follows:

> The Court finds the report of the CASA/Guardian Ad Litem consistent with the evidence presented and is well-taken.
>
> The Court also conducted an in-camera interview with each of the three girls after the conclusion of the trial in this matter. The CASA/Guardian Ad Litem was present. The children's respective ages at the time of the interview were: B.S., 13 years old, H.S., 11 years old and W.S., 8 years old.
>
> Each of the children presented as young and immature for their ages. A finding that is also supported by other evidence regarding the children's respective developmental levels. Each child expressed certain wishes and concerns consistent with other evidence presented.
>
> As noted in other testimony B.S. and W.S. are bonded with their parents, having expressed wishes to 'go home.' H.S., as acknowledged by her Mother, has no such desire.
>
> Although both B.S. and W.S. expressed their wishes, they were unable to verbalize any concerns about life at home with their parents— seemingly not cognizant regarding their hygiene, medical, education, housing and other noted problems. Neither of them expressed concerns about their foster parent(s).
>
> With respect to H.S. the Court finds little or no evidence of a bond with the parents. As noted in other testimony she does not wish to return home, but her wishes appeared an immature reaction to her circumstances because life in foster care has been more stable and more beneficial. Whether her wishes would be different if her parents could handle matters more appropriately is an open question.
>
> Most importantly, without any doubt, it was glaringly obvious that what each child desired most was for finality in this matter.
>
> Generally, the children are bonded with each other, although this appears secondary to their preferred living environments.

The Court has given great thought to the interviews and the maturity and practicality of each child's wishes and concerns. This decision takes into account those wishes and concerns and weighs them in light of the evidence presented and concerns for their health, safety, and welfare.

(Dec. 2, 2024 Judgment Entries).

{¶83} Accordingly, Anna argues that because B.S. and W.S.'s wishes to "go home" were seemingly in conflict with the GAL's recommendation for the Agency to receive permanent custody, the trial court should have appointed an attorney for B.S. and W.S. to advocate for their wishes.[2]

*Relevant Law*

{¶84} "[P]ursuant to R.C. 2151.352, . . . a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *In re D.M.*, 2019-Ohio-1497, ¶ 8 (3d Dist). "However, the Court did caution that this rule must be applied on a case-by-case basis 'taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child.'" *Id*., quoting *In re Williams*, 2004-Ohio-1500, ¶ 17. Appellate courts have addressed this type of situation and found that a court should ordinarily appoint independent counsel for a child when "certain circumstances are found." *Id.* at ¶

---

[2] Anna, at times, includes H.S. in her argument that the trial court should have appointed an attorney for the children because their wishes conflicted with the GAL's recommendation. However, H.S. did not express a desire to return to Michael and Anna's home, a fact that Anna concedes. Accordingly, to the extent that Anna argues that the trial court erred by not appointing an attorney for H.S. because her wishes conflicted with those of the GAL, that argument is misplaced.

10, citing *Matter of B.J.L.*, 2019-Ohio-555, ¶ 46 (4th Dist.). "One of the circumstances is 'when the child has consistently and repeatedly expressed a strong desire that differs and is otherwise inconsistent with the guardian ad litem's recommendations.'" *Id.*, quoting *In re V.L.*, 2016-Ohio-4898, ¶ 39 (12th Dist.). "'However, a trial court generally need not "consider the appointment of counsel based upon a child's occasional expression of a wish to be with a parent or because of a statement made by an immature child."'" *Id.*, quoting *Matter of B.J.L.* at ¶ 48, quoting *In re N.P.*, 2016-Ohio-3125, ¶ 14 (11th Dist.).

*Analysis*

{¶85} Anna alleges that because B.S. and W.S. expressed that they wanted to "go home" during the in-camera interview, which is in conflict with the GAL's recommendation that the Agency receive permanent custody of the girls, the trial court should have appointed an attorney to advocate for B.S. and W.S.'s position. We disagree.

{¶86} First, the record does not indicate that B.S. and W.S. "consistently and repeatedly" expressed a desire to return to Anna and Michael's home. Rather, it appears that B.S. and W.S.'s statements were isolated and were not made consistently and repeatedly. Furthermore, the parenting coach's testimony that she overheard Michael telling the girls to say that they wanted to go home, calls into question the veracity and voluntariness of the B.S. and W.S.'s statements.

{¶87} Additionally, by all indications, B.S. and W.S., despite their ages, were not mature children. It was well-established at trial that all of the children were immature for their ages and had some level of cognitive impairment, with B.S.'s cognitive impairment being the most profound.

{¶88} Importantly, the trial court's judgment entry indicates that the trial court actually did consider the wishes of each of the girls, even if the trial court's decision was not in concert with the children's specific desires. Accordingly, the trial court appeared to weigh all of the statements made in the in-camera interview in light of the evidence presented and the totality of the circumstances.

{¶89} Thus, we find Anna's argument that the trial court erred by not appointing counsel for B.S. and W.S. to be unavailing.

{¶90} Anna's first assignment of error is overruled.

*Conclusion*

{¶91} Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we overrule the assignments of error and affirm the judgments of the Shelby County Court of Common Pleas, Juvenile Division.

***Judgments Affirmed***

**WALDICK, P.J. and WILLAMOWSKI, J., concur.**

# JUDGMENT ENTRY

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgments of the trial court are affirmed with costs assessed to Appellants for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Mark C. Miller, Judge

_____
Juergen A. Waldick, Judge

_____
John R. Willamowski, Judge

DATED:
/jlm